**AMERICAN CIVIL LIBERTIES UNION OF TENNESSEE,**
et al.

v.

**Riley C. DARNELL, et al.**

Supreme Court of Tennessee,
at Nashville.

June 7, 2006 Session.

July 14, 2006.

Melody Fowler–Green, Abby R. Ruben-
feld, and Anne C. Martin, Nashville, Ten-

nessee, for the appellants, American Civil Liberties Union of Tennessee, Tennessee Equality Project, Beverly Robison Marrero, Bruce Barry, Jonathan Hines, Scott Hines, Nina Pacent, Renee Kasman, Larry Turner, and Tommie Brown.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Ann Louise Vix, Senior Counsel; Gina J. Barham, Deputy Attorney General; and Marnee L. Baker, Assistant Attorney General, Nashville Tennessee, for the appellees, Riley C. Darnell, Brook Thompson, Paul G. Summers, John S. Wilder, and James O. Naifeh.

Benjamin W. Bull, Glen Lavy, Byron J. Babione, Heather Gebelin Hacker, Scottsdale, Arizona, Nathan W. Kellum, Memphis, Tennessee, and David L. Maddox, Nashville, Tennessee, for the Intervenors, sixty-seven members of the Tennessee House of Representatives and twenty-three members of the Tennessee Senate.

Michael B. Bressman, Nashville, Tennessee, for Amicus Curiae, Public Notice Resource Center.

Robyn E. Smith, Nashville, Tennessee, for Amicus Curiae, Tennessee Chapter of the National Organization for Women.

## Opinion

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.

We assumed jurisdiction of this case pursuant to Tennessee Code Annotated section 16-3-201 to consider whether the Chancellor erred by refusing to declare Senate Joint Resolution 31 unconstitutional and by refusing to enjoin the Secretary of State from placing a proposed amendment to the Tennessee Constitution on the November 7, 2006 ballot for a ratification vote. Having fully considered the record, the relevant authority, and the written and oral presentations of the parties—and wishing to decide this constitutional matter, as we should, on the narrowest grounds possible—we affirm the Chancellor's decision dismissing the complaint because Plaintiffs have failed to establish that they have standing to bring this lawsuit.

## I. BACKGROUND

Article XI, section 3 of the Tennessee Constitution provides:

Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals with the yeas and nays thereon, and referred to the general assembly then next to be chosen; and shall be published six months previous to the time of making such choice; and if in the general assembly then next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by two-thirds of all the members elected to each house, then it shall be the duty of the general assembly to submit such proposed amendment or amendments to the people at the next general election in which a Governor is to be chosen. And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the State voting for Governor, voting in their favor, such amendment or amendments shall become a part of this Constitution. When any amendment or amendments to the Constitution shall be proposed in pursuance of the foregoing provisions the same shall at each of said

sessions be read three times on three several days in each house.

Pursuant to this constitutional provision, on March 17, 2004, Representative Bill Dunn introduced in the House of Representatives of the 103rd General Assembly, House Joint Resolution 990 ("HJR 990"), which proposed an amendment "relative to the marital contract between one man and one woman" ("Marriage Amendment"). HJR 990 provided in relevant part:

> BE IT RESOLVED BY THE HOUSE OF REPRESENTATIVES OF THE ONE HUNDRED THIRD GENERAL ASSEMBLY OF THE STATE OF TENNESSEE, THE SENATE CONCURRING, that a majority of all the members of each house concurring, as shown by the yeas and nays entered on their journals, that it is proposed that Article XI of the Constitution of the State of Tennessee be amended by adding the following language as a new, appropriately designated section:

> SECTION ——. The historical institution and legal contract solemnizing the relationship of one man and one woman shall be the only legally recognized marital contract in this state. Any policy or law or judicial interpretation purporting to define marriage as anything other than the historical institution and legal contract between one man and one woman, is contrary to the public policy of this state and shall be void and unenforceable in Tennessee. If another state or foreign jurisdiction issues a license for persons to marry and if such marriage is prohibited in this state by provisions of this section, then the marriage shall be void and unenforceable in this state.

> BE IT FURTHER RESOLVED, that the foregoing amendment be referred to the One Hundred Fourth General Assembly and that this resolution proposing such amendment be published by the Secretary of State in accordance with Article XI, Section 3, of the Constitution of the State of Tennessee.

The General Assembly posted HJR 990 on its official website from the time of HJR 990's introduction on March 17, 2004. In addition, on March 25, April 22, April 29, and May 6, 2004, the Republican Caucus of the House of Representatives posted press releases on its website summarizing legislative action on HJR 990. The press release posted on April 22 included a link to the General Assembly's website and the text of the proposed Marriage Amendment. In addition, from the time of HJR 990's introduction, the Marriage Amendment received a great deal of coverage in print and television media outlets across the State. On more than one occasion, newspaper articles and television news reports provided the full text of the Marriage Amendment.

The House of Representatives approved HJR 990 on May 6, 2004, by a vote of eighty-five to five. The measure received Senate approval by a vote of twenty-eight to one on May 19, 2004, approximately five and one-half months prior to the election of the 104th General Assembly on November 2, 2004 ("2004 election"). The Secretary of State then prepared a legal notice [1] containing the full text of the HJR 990. This notice was published in six Tennessee newspapers [2] on June 20, 2004, approxi-

---

**1.** The notice published by the Secretary of State on June 20, 2004, also included the text of a Senate Joint Resolution 71, which proposed "an amendment to Article II, Section 28 of Constitution of the State of Tennessee,

to authorize property tax relief for senior citizens."

**2.** The notice was published in the Chattanooga *Times Free Press;* the *Jackson Sun;* the

mately four and one-half months prior to the 2004 election.

When the 104th General Assembly convened after the 2004 election, Senator Jeff Miller introduced Senate Joint Resolution 31 ("SJR 31"), providing as follows:

BE IT RESOLVED BY THE SENATE OF THE ONE HUNDRED FOURTH GENERAL ASSEMBLY OF THE STATE OF TENNESSEE, THE HOUSE OF REPRESENTATIVES CONCURRING, That a two-thirds majority of all the members of each house concurring, as shown by the yeas and nays entered on their journals, that it is proposed that Article XI of the Constitution of the State of Tennessee be amended by adding the following language as a new appropriately designated section:

SECTION —. The historical institution and legal contract solemnizing the relationship of one man and one woman shall be the only legally recognized marital contract in this state. Any policy or law or judicial interpretation purporting to define marriage as anything other than the historical institution and legal contract between one man and one woman, is contrary to the public policy of this state and shall be void and unenforceable in Tennessee. If another state or foreign jurisdiction issues a license for persons to marry and if such marriage is prohibited in this state by provisions of this section, then the marriage shall be void and unenforceable in this state.

BE IT FURTHER RESOLVED, That, in accordance with Article XI, Section 3, of the Constitution of the State of Tennessee, the foregoing amendment shall be submitted to the people at the next general election in which a Governor is to be chosen, the same being the 2006 November general election, and the Secretary of State is directed to place such amendment on the ballot for that election.

BE IT FURTHER RESOLVED, That the Clerk of the Senate is directed to deliver a copy of this Resolution to the Secretary of State.

The 104th General Assembly approved SJR 31 by the constitutionally required two-thirds majority. The Senate approved the measure on February 28, 2005, by a vote of twenty-nine to two, and the House of Representatives approved the measure on March 17, 2005, by a vote of eighty-eight to seven. The Marriage Amendment was then slated to be submitted to the voters for a ratification vote at the November 7, 2006, gubernatorial election.

However, on April 21, 2005, Plaintiffs [3] filed a complaint in the Davidson County Chancery Court against Defendants [4] seeking to enjoin the Secretary of State from including the Marriage Amendment on the November 7, 2006, ballot. Plaintiffs al-

---

*Kingsport Times–News;* the *Knoxville News Sentinel;* the Memphis *Commercial Appeal;* and the Nashville *Tennessean.*

3. The term "Plaintiffs" includes two organizations, American Civil Liberties Union ("ACLU") and Tennessee Equality Project ("TEP"); five citizens—Bruce Barry, Scott Hines, Jonathan Hines, Renee Kasman, and Nina Pacent; and three members of the Tennessee House of Representatives—Representatives Larry Turner, Beverly Robison Marrero, and Tommie Brown.

4. The term "Defendants" includes the following persons, who have been sued in their official capacities: Riley C. Darnell, Secretary of State; Brook K. Thompson, Coordinator of Elections; Paul G. Summers, Attorney General and Reporter; John S. Wilder, Lieutenant Governor and Speaker of the Senate; and James O. "Jimmy" Naifeh, Speaker of the House of Representatives.

leged that the Marriage Amendment had not been "published six months previous" to the 2004 election as required by the publication clause of Article XI, section 3 of the Tennessee Constitution. Plaintiffs maintained that the failure to timely publish the proposed amendment had invalidated the amending process. Therefore, Plaintiffs argued that SJR 31 violates the Tennessee Constitution "by commanding the Secretary of State ... to place the proposed amendment on the ballot in 2006." Moreover, Plaintiffs alleged that the failure to timely publish the Marriage Amendment "hindered" their "lobbying efforts because their ability to engage an informed electorate was compromised." Plaintiffs, Renee Kasman and Nina Pacent, and Scott Hines and Jonathan Hines, further alleged that as gay couples wishing to marry in Tennessee, the failure to timely publish the Marriage Amendment harmed them because they "will be required to seek a change in the state constitution, rather than a legislative change." Plaintiffs asked the Chancellor to declare SJR 31 unconstitutional and void and to enjoin Defendants from placing the Marriage Amendment on the November 7, 2006, ballot.

Sixty-seven members of the Tennessee House of Representatives, including Representative Dunn, and twenty-three members of the Tennessee Senate, including Senator Miller,[5] sought and obtained permission to intervene in this litigation as defendants ("Intervenors"). Thereafter, the parties conducted discovery and then filed cross motions for summary judgment, with all parties agreeing that the facts are undisputed.

In a memorandum opinion and order filed February 23, 2006, the Chancellor denied Plaintiffs' requests for declaratory and injunctive relief and dismissed the case with prejudice. Although the Chancellor found that Plaintiffs had failed to establish "an injury in fact" sufficient to afford them standing, the Chancellor considered and rejected Plaintiffs' claim that the Marriage Amendment had not been published six months prior to the 2004 election in accordance with Article XI, section 3. The Chancellor emphasized that Article XI, section 3 uses "broad and general" language, that it does not expressly mandate a particular method or means of publication, and that it does not explicitly require publication to occur after adoption of a proposed amendment. The Chancellor concluded that publication may occur prior to adoption of proposed constitutional amendments and that publication need not be accomplished by an official act of the General Assembly. Rather, the Chancellor explained that Article XI, section 3 is satisfied by proof that "the text of the proposed Amendment was published, i.e., made known to the public, six months before the election of the next General Assembly...." In this case, the Chancellor concluded that the "broad and general wording of Article XI, section 3" was satisfied by "the actual, although not official, publication" of the Marriage Amendment on the General Assembly's website, the fact that the language of the Marriage Amendment remained the same from the time of its introduction, the extensive media publication of the Marriage Amendment prior to and after its adoption, and the Secretary of State's June 20, 2004, publication. Therefore, the Chancellor refused to declare SJR 31 unconstitutional, denied Plaintiffs' request to enjoin the Secretary of State from placing the Marriage

---

**5.** The motion to intervene lists the names of all Representatives and Senators appearing as Intervenors in this action.

Amendment on the November 7, 2006, ballot, and dismissed Plaintiffs' complaint.

Plaintiffs immediately appealed, filing in the Court of Appeals a notice of appeal and simultaneously filing a motion asking this Court to assume jurisdiction of the case pursuant to Tennessee Code Annotated section 16–3–201(d). On March 15, 2006, we granted the motion to assume jurisdiction, set an expedited briefing schedule, and scheduled oral argument for June 7, 2006.

In this appeal, Plaintiffs claim that the Chancellor erred in interpreting Article XI, section 3. Plaintiffs assert that Article XI, section 3 provides a mandatory sequential process that may only be satisfied by literal compliance, that any deviation, however slight, is fatal to the amending process, and that the failure to publish the Marriage Amendment six months prior to the 2004 election by an official act of the General Assembly constitutes a deviation from the mandates of Article XI, section 3, which invalidated the amending process and which also precludes the Marriage Amendment from appearing on the November 7, 2006, ballot.

Defendants and Intervenors respond that the Chancellor's interpretation of Article XI, section 3 is legally and grammatically sound and that the Marriage Amendment was published in literal compliance with Article XI, section 3 because Article XI, section 3 permits publication prior to adoption of a proposed amendment and contemplates "unofficial" methods of publication, such as media coverage and internet publication. Should this Court conclude that the Marriage Amendment was not published in literal compliance with Article XI, section 3, Defendants and Intervenors ask this Court to adopt the substantial compliance doctrine and to hold that the Marriage Amendment was published in substantial compliance with Article XI, section 3, considering the totality of the circumstances, including the official publication, the internet posting, and the media attention given the Marriage Amendment.

Plaintiffs, Defendants, and Intervenors have presented cogent and thorough arguments concerning the proper interpretation of Article XI, section 3, an important issue of state constitutional law.[6] However, resolution of this important issue must be reserved for another day. Having fully considered the record, the relevant authority, and the excellent written and oral presentations of the parties, we affirm the Chancellor's judgment of dismissal because Plaintiffs have failed to establish standing to bring this action.

## II. STANDING

▉▉▉ Courts employ the doctrine of standing to determine whether a particular litigant is entitled to have a court decide the merits of a dispute or of particular issues. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Knierim v. Leatherwood,* 542 S.W.2d 806, 808 (Tenn.1976) (holding that courts use the standing doctrine to decide whether a particular plaintiff is "properly situated to prosecute the action."); *City of Brentwood v. Metropolitan Bd. of Zoning Appeals, et al.,* 149 S.W.3d 49, 55 (Tenn.Ct.App.2004), *perm. app. denied* (Tenn. Sept. 13, 2004). Grounded upon "concern about the proper—and properly limited—role of the courts in a democratic society," *Warth,* 422 U.S. at 498, the doctrine of standing precludes courts from adjudicating "an action at the instance of one whose rights have not been invaded or infringed." *Mayhew*

---

**6.** We also appreciate the excellent briefs filed by Amicus Curiae Public Notice Resource Center and Tennessee Chapter of the National Organization for Women.

*v. Wilder*, 46 S.W.3d 760, 767 (Tenn.Ct. App.2001), *perm. app. denied* (Tenn. April 30, 2001). The doctrine of standing restricts "[t]he exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, . . . to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.* 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Without limitations such as standing and other closely related doctrines [7] "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth*, 422 U.S. at 500; *see also DaimlerChrysler Corp. v. Cuno*, —— U.S. ——, ——, 126 S.Ct. 1854, 1856, 164 L.Ed.2d 589 (2006) (explaining that standing enforces the constitutional case-or-controversy requirement that is "crucial in maintaining the 'tripartite allocation of power' set forth in the Constitution").

▮ To establish standing, a plaintiff must show three "indispensable" elements "by the same degree of evidence" as other matters on which the plaintiff bears the burden of proof. *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767 (Tenn.Ct. App.2002), *perm. app. denied* (Tenn. Sept. 9, 2002). First, a plaintiff must show a distinct and palpable injury: conjectural or hypothetical injuries are not sufficient. *City of Brentwood*, 149 S.W.3d at 55–56; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119

L.Ed.2d 351 (1992). Standing also may not be predicated upon an injury to an interest that the plaintiff shares in common with all other citizens. *Mayhew*, 46 S.W.3d at 767. Were such injuries sufficient to confer standing, the State would be required to defend against "a profusion of lawsuits" from taxpayers, and a purpose of the standing doctrine would be frustrated. *See Parks v. Alexander*, 608 S.W.2d 881, 885 (Tenn.Ct.App.1980) (stating that one purpose of standing is to protect the State from a "profusion of lawsuits").

▮ The second essential element of standing is a causal connection between the claimed injury and the challenged conduct. *Mayhew*, 46 S.W.3d at 767. A plaintiff may satisfy this element by establishing the existence of a "fairly traceable" connection between the alleged injury in fact and the defendant's challenged conduct. *DaimlerChrysler Corp.*, —— U.S. at ——, 126 S.Ct. at 1861. The third and final element necessary to establish standing is a showing that the alleged injury is capable of being redressed by a favorable decision of the court. *Petty*, 91 S.W.3d at 767; *DaimlerChrysler Corp.*, —— U.S. at ——, 126 S.Ct. at 1861.

▮ It is important to note that standing does not depend upon a plaintiff's likelihood of success on the merits; however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. *City of Brentwood*, 149 S.W.3d at 56. Specifically, courts should inquire:

Is the injury too abstract, or otherwise not appropriate, to be considered judi-

---

**7.** "The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention—and of moot-ness—whether the occasion for judicial intervention persists." *Warth*, 422 U.S. at 499 n. 10, 95 S.Ct. 2197.

cially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?

*Allen v. Wright* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

In this case, the Chancellor found that Plaintiffs had failed to establish the first element necessary to confer standing—"injury in fact." Plaintiffs alleged in their complaint that their ability to lobby an informed electorate was hindered by the Secretary of State's untimely publication; yet, the Chancellor found that Plaintiffs failed to offer proof of "hard, concrete facts" showing that Plaintiffs "put forth an actual lobbying effort on the proposed Amendment for the 2004 election of the General Assembly." The Chancellor summarized the proof as follows:

> The only proof, and it is sketchy at best, is that some of the plaintiffs testified in their depositions that they contacted their legislators. The plaintiffs have not presented this Court with testimony of telephone trees, ad campaigns, mailings to the public, billboards, trailers on the weather channel, pamphlet handouts, or any sort of discernible lobbying effort mounted before the November 2004 election to show that they attempted to lobby the electorate, much less that they were deterred in that effort by untimely official publication. Nor have the plaintiffs presented the Court with testimony of the kind of lobbying they have used in other states, the timing of that lobbying and the budget, to establish, by comparison, that the Tennessee effort was compromised. Additionally, the plaintiffs have not provided the Court with testimony of the details of present lobbying efforts, opposing ratification of the proposed

Amendment, to show what campaign could have been mounted for the 2004 election of the General Assembly had the official publication been timely. As the record stands, there is insufficient proof of an actual lobbying effort in connection with the November 2004 election.

In this Court, Plaintiffs maintain that the Chancellor erred in concluding that they had not shown an injury in fact. Plaintiffs assert that their "lives and families" and their "ability to seek change in the law in the future will be greatly hindered" by the Marriage Amendment. Plaintiffs also assert that the individual gay and lesbian Plaintiffs have suffered a " 'special injury' different than the general population who are not lesbian or gay" because these Plaintiffs wish "to be married in Tennessee but would be prohibited from doing so by their state constitution if the proposed Amendment is adopted." Plaintiffs further assert that their status as Tennessee voters provides them standing to bring this action.

Defendants and Intervenors maintain that the Chancellor properly held that Plaintiffs have not shown a distinct, concrete injury in fact sufficient to confer upon them standing. Defendants and Intervenors allege that Plaintiffs' sexual orientation and interest in same gender marriage concern the substance of the Marriage Amendment but do not provide Plaintiffs standing to challenge the Marriage Amendment on the basis that it was not published in compliance with Article XI, section 3 because any deficiency in the timeliness of publication "operated on all members of the public equally, whether gay or not." Plaintiffs' status as voters does not afford them standing, Defendants and Intervenors assert, because Plaintiffs are seeking to prevent a ratification vote on the Marriage Amendment rather than

attempting to vindicate the right to vote. Defendants and Intervenors further maintain that Plaintiffs have failed to demonstrate a causal connection between their alleged injuries and the alleged untimely publication. Finally, Defendants and Intervenors maintain that the redress Plaintiffs seek—enjoining an election—is not relief ordinarily accorded by Tennessee courts.

As explained in detail below, we agree with the Chancellor that Plaintiffs have failed to establish a distinct, concrete injury in fact resulting from the alleged untimely publication of the Marriage Amendment. Moreover, we conclude that Plaintiffs have failed to establish any causal connection between their claimed injuries and the alleged illegality—untimely publication. Finally, we decline to comment on whether the Plaintiffs have satisfied the redressibility prong of our test for standing, preferring to "to decide constitutional issues on the narrowest grounds possible and to refrain from 'anticipat[ing][a] question of constitutional law in advance of the necessity of deciding it.'" *Hinton v. Devine*, 633 F.Supp. 1023, 1030 (E.D.Pa.1986) (quoting *Burton v. United States*, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905)). Accordingly, we hold that Plaintiffs do not have standing to bring this action.

### A. Individual Plaintiffs [8]

■ The record on appeal clearly indicates that the individual Plaintiffs were aware of the proposed Marriage Amendment prior to the 2004 election, despite the alleged untimely publication. Moreover, the individual Plaintiffs have neither alleged nor even suggested that they learned of the Marriage Amendment from the notice published by the Secretary of State on June 20, 2004. In fact, none of the Plaintiffs saw this notice. Additionally, as the Chancellor found, Plaintiffs failed to establish that the alleged untimely publication impaired their right to vote in the 2004 election or precluded them from supporting candidates in the 2004 election who opposed the proposed Marriage Amendment. Plaintiffs also failed to establish that the alleged untimely publication precluded them from planning or conducting prior to the 2004 election lobbying or grassroots campaigns against the Marriage Amendment.

As proof of an injury in fact, Plaintiffs point to allegations and deposition testimony of Plaintiffs Renee Kasman and Scott Hines. Plaintiff Renee Kasman, "a citizen of Tennessee with a same-sex domestic partner of 20 years whom she wishes to marry," testified that if she had been aware of the Marriage Amendment sooner, she would have spent more time and energy determining whether the candidates running to represent her district in the 2004 election supported or opposed the Marriage Amendment, and she would have lobbied these candidates with her views on the Marriage Amendment. Kasman maintained that she needed "time just to catch up to speed on how the process works."

Despite this testimony, an e-mail Kasman produced during discovery indicates that she became aware of HJR 990 and the Marriage Amendment as early as March

---

8. This term includes Barry Bruce, Scott Hines, Jonathan Hines, Renee Kasman, and Nina Pacent. Our analysis focuses upon Scott Hines and Renee Kasman, however, because none of the other individual Plaintiffs provided any specific allegations or evidence to establish a distinct, concrete injury in fact from the alleged untimely publication. However, because two Plaintiffs share the surname "Hines," for the sake of clarity, this opinion uses the full name, "Scott Hines."

21, 2004,[9] only four days after HJR 990's introduction and long before the 2004 election. Kasman has failed to show how the alleged untimely publication rendered her unaware of the Marriage Amendment. Kasman admitted that she did not vote in the 2004 state legislative races, claiming that she had not been able to determine the candidates' positions on the Marriage Amendment. However, Kasman has not shown that her inability to determine the candidates' positions resulted from the alleged untimely publication. In fact, Kasman indicated that she had been unable to determine the candidates' positions on the Marriage Amendment because the campaign had focused on personalities rather than issues. Kasman at no time explained how or why she would have been able or better able to determine the candidates' position on the Marriage Amendment if the Secretary of State had published notice of the Marriage Amendment on May 2, 2004, rather than June 20, 2004.

Plaintiff Scott Hines also "is in a committed same-sex relationship and is personally affected by the proposed amendment." The record reflects that Scott Hines knew of the Marriage Amendment prior to the 2004 election, that he contacted his state representative and state senator to express opposition to the Marriage Amendment, that he contacted other members of the General Assembly via telephone and electronic mail to express opposition to the measure, and that both he and Jonathan Hines attended legislative committee hearings and talked with legislators about several issues, including the Marriage Amendment.

However, Scott Hines maintained that he would have done more, but organizations, such as ACLU and TEP, that he relies upon to direct his lobbying activities "got started late in the process because notification did not happen." According to Scott Hines, if publication had been timely these organizations would have known of the Marriage Amendment earlier and could have advised him to lobby in "a variety of other ways" from "holding up street signs to putting sign markers in yards." Scott Hines opined that "[t]here are only certain things that informed citizens can do as individuals, and I think we did those things. I called, I e-mailed my representatives and told them I didn't want them to do this. And I did that soon after I found out about this and was notified through some of the grassroot organizations that I belong to . . . ."

Scott Hines' assertion that he was precluded from additional lobbying activities because the alleged untimely publication resulted in organizations not being aware of the Marriage Amendment is belied by the record on appeal. Indeed, the executive director of ACLU testified that she learned of HJR 990 on the day it was introduced and aggressively lobbied against its passage. Responses to interrogatories filed on behalf of TEP indicate that it was formed to oppose HJR 990 and that, although TEP did not convene its first official Board meeting until September 2004, TEP officers and board members "had numerous person-to-person conversations with state legislators in April and May of 2004 on behalf of the group that would later be called the Tennessee Equality Project. All such conversations were

9. Exhibit K of the "Intervenors' Exhibits in Support of Motion for Summary Judgment" is an e-mail Renee Kasman received on March 21, 2004, which urges readers to "FIGHT FOR YOUR RIGHTS!!!" by calling legislators "immediately" and by turning out on March 23, 2004, at 3:00 p.m. to show opposition to a "House Joint Resolution by Rep. Bill Dunn [that] will place in the State Constitution that [sic] an amendment declaring that marriage is only between a man and woman."

about HJR 990." TEP continued its efforts to oppose HJR 990 in May and throughout the summer and fall of 2004. TEP eventually hired a lobbyist to represent its interest during the 104th General Assembly and considered SJR 31 and the Marriage Amendment one of the "most important issues" for the TEP lobbyist to address. In sum, the proof in the record refutes Scott Hines' assertion that the alleged untimely publication resulted in interested organizations being unaware of the Marriage Amendment and unable to direct his lobbying activities.

Scott Hines also testified that he would have contributed more money to candidates opposing the Marriage Amendment had he known of the measure sooner. However, Scott Hines did not identify the candidates to whom he would have contributed money. In addition, Scott Hines stated that he voted for Representative Gary Odom in the 2004 election knowing that Representative Odom supported the Marriage Amendment. Finally, Scott Hines failed to explain how publication of the Marriage Amendment on June 20, 2004, rather than May 2, 2004, hindered or precluded him from contributing to candidates opposing the Marriage Amendment. Like Kasman, Scott Hines has not shown a causal connection between his claimed injury and the alleged illegality. *See Korioth v. Brisco*, 523 F.2d 1271, 1275 (5th Cir.1975) ("[A]lthough an irate citizen might vigorously pursue litigation challenging alleged governmental illegalities, a court cannot fashion a specific remedy without some finding of specific harm.").

Kasman and Hines also may not predicate standing to bring this lawsuit upon their belief that the Marriage Amendment will adversely affect their lives and their legal rights and liabilities if it is ratified. Plaintiffs' sexual orientation and interest in same gender marriage simply are not relevant to their claim that the Marriage Amendment was not published in accordance with Article XI, section 3. Plaintiffs' reliance upon *Campbell v. Sundquist*, 926 S.W.2d 250 (Tenn.Ct.App.1996) *perm. app. denied* (Tenn.1996), to afford them standing is misplaced. Plaintiffs in *Campbell* were challenging the constitutionality of a criminal statute, titled "The Homosexual Practices Act," which threatened their liberty interests. As the Defendants and Intervenors point out, any deficiency in the timeliness of publication of the Marriage Amendment "operated on all members of the public equally, whether gay or not." Standing may not be predicated upon injury to an interest that a plaintiff shares in common with all citizens.

Plaintiffs also argue that they have "special standing" as voters, and rely upon *Walker v. Dunn*, 498 S.W.2d 102 (Tenn. 1972), *Bergdoll v. Kane*, 557 Pa. 72, 731 A.2d 1261, 1268 (1999), and *Moore v. Shanahan*, 207 Kan. 1, 486 P.2d 506 (1971) to support this argument. Plaintiffs are mistaken. In *Walker*, the General Assembly met in special session to ratify a proposed amendment to the United States Constitution. The *Walker* plaintiffs claimed that this action violated Article II, section 32 of the Tennessee Constitution and wholly deprived them of their right to vote for the General Assembly that would be charged with ratifying the amendment. This Court described the plaintiffs' allegations as sufficient to establish a "real interest in the suit," *id.* at 105, and held that the plaintiffs' had standing as voters to maintain the lawsuit challenging an action that had denied them of their right to vote. Thus, despite Plaintiffs' assertions to the contrary, standing in *Walker* was predicated upon a distinct, concrete injury in fact— denial of the right to vote. Standing was not predicated upon the *Walker* plaintiffs' status as voters. *See also Schultz v. Lewallen*, 188 Tenn. 206, 217 S.W.2d 944

(1948) (holding that voters lacked standing to bring suit to enjoin elections in two county district); *State ex rel. Hammond v. Wimberly*, 184 Tenn. 132, 196 S.W.2d 561 (1946) (holding that voters lacked standing to sue to enjoin local officials from certifying a recall petition and holding a recall election); *Parks*, 608 S.W.2d 881 (holding that voters lacked standing to challenge a constitutional amendment under Article XI, section 3).

Unlike the *Walker* plaintiffs, Plaintiffs in this case are not seeking to vindicate their right to vote. Rather, Plaintiffs are asking this Court to enjoin an election. Plaintiffs were not denied their right to vote in the 2004 election. In addition, as previously noted, Plaintiffs were aware of the Marriage Amendment before the 2004 election and were able to consider it when voting in the 2004 election. Plaintiffs have failed to establish that their right to vote in the 2004 election was compromised by the Secretary of State publishing the Marriage Amendment on June 20, 2004, rather than May 2, 2004.[10]

▮▮▮ Finally, having held that the Plaintiffs fail to satisfy the first and second prongs of our test for standing, we refrain from addressing whether they satisfy the third and final prong as well. "Well-settled principles of judicial restraint establish that when a case must be decided upon constitutional grounds, a court should strive to resolve the matter as narrowly as possible...." *Powers v. City of Richmond*, 10 Cal.4th 85, 40 Cal.Rptr.2d 839, 857, 893 P.2d 1160 (1995). Because standing to be heard requires the Plaintiffs to fulfill three requirements—cognizable injury, causation, and redressibility—it is not necessary for us to reach the issue of whether Plaintiffs have proved that the relief requested from this Court would redress the putative injuries of which they complain. We decline to address this issue here.

### B. Legislator Plaintiffs

▮▮▮ Legislators have no special right to standing simply by virtue of their status: like other plaintiffs, legislators must establish a distinct, concrete injury in fact. *Mayhew*, 46 S.W.3d at 767 (noting that "[a] legislator does not have a special standing to challenge a statute where the statute does not impede his legislative power"); *see also Raines v. Byrd*, 521 U.S. 811, 830, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (holding that individual members of Congress lacked standing to challenge the constitutionality of the Line Item Veto Act because they had failed to allege a "sufficient personal stake" in the dispute or a "sufficiently concrete injury" resulting from adoption of the statute); *Coleman v. Miller*, 307 U.S. 433, 438, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (holding that legislators whose votes would have been sufficient to defeat a legislative Act had standing to sue on the ground that their votes had been completely nullified); *Korioth*, 523 F.2d at 1275 (holding that a state legislator lacks standing to challenge constitutionality of a state statute where he failed to allege that the effectiveness of his vote or any other legislative power he might have had was

10. Similarly, the Pennsylvania and Kansas cases upon which Plaintiffs rely do not support their claim that voters may challenge proposed constitutional amendments without establishing the three essential elements of standing, including a concrete, distinct injury in fact. In these cases, the plaintiffs alleged that they had been deprived of their right to vote on separate constitutional amendments because a single ballot question had encompassed several proposed amendments. The courts found this allegation sufficient to afford the plaintiffs standing. However, in neither of these cases did the defendants raise the standing issue at the trial court level. *Bergdoll*, 731 A.2d 1261; *Moore*, 486 P.2d 506.

impeded either by the majority vote or by implementation of the statute).

The record reveals that on March 17, 2005, prior to approving SJR 31, the House of Representatives extensively discussed whether HJR 990 had been published in accordance with Article XI, section 3.[11] After the discussion, SJR 31 passed the House by a vote of eighty-eight to seven, with one abstention. Although the legislator Plaintiffs were outvoted, the record reveals that they had ample opportunity to discuss SJR 31 prior to the vote and to vote on the measure. In short, the legislator Plaintiffs have failed to establish that the effectiveness of their vote or any of their other legislative powers was impeded by the alleged untimely publication. Thus, the legislator Plaintiffs have failed to establish an injury sufficient to confer standing.

### C. Organizational Plaintiffs

To establish standing, an association, such as ACLU or TEP, must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Citizens for Collierville, Inc. v. Town of Collierville*, 977 S.W.2d 321, 323 (Tenn.Ct. App.1998) *perm. app. denied* (Tenn. Sept. 14, 1998); *Curve Elementary Sch. Parent & Teacher's Org. v. Lauderdale County Sch. Bd.*, 608 S.W.2d 855, 858 (Tenn.Ct.

App.1980), *perm. app. denied* (Tenn. June 30, 1980) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). We need not belabor the analysis. Having previously determined that none of the individual or legislator Plaintiffs has standing to sue in his or her own right, we have no hesitation in concluding that ACLU and TEP lack standing to maintain this lawsuit.

### IV. CONCLUSION

Plaintiffs failed to demonstrate a distinct, concrete injury in fact resulting from the alleged untimely publication of the Marriage Amendment. In addition, Plaintiffs failed to establish that their claimed injuries were causally connected to the alleged untimely publication of the Marriage Amendment. Therefore, Plaintiffs lack standing to bring this action. The Chancellor's decision dismissing Plaintiffs' complaint is affirmed on this basis alone. We express no opinion on whether the Chancellor properly interpreted Article XI, section 3 or whether the doctrine of substantial compliance applies to Article XI, section 3. Like the Chancellor, we leave for the General Assembly's consideration the policy "issue of whether the Legislature should conduct the affairs of the people in such a risky manner as to be hailed into court to prove that the timing, volume and content of independent media coverage establish compliance with the constitutional publication requirement."[12]

11. *See* Transcript of the March 17, 2005 session of the Tennessee House of Representatives, attached as Exhibit A to the Affidavit of Christine Morrison.

12. The General Assembly has the authority to adopt a rule or enact a statute that defines the term "published" used in Article XI, section 3 or that specifies the means and manner of publication. When interpreting constitutional provisions, courts carefully consider any interpretation the General Assembly has given the provision. *Metro. Gov't of Nashville & Davidson County v. Tenn. State Bd. of Equalization*, 817 S.W.2d 953, 955 (Tenn.1991). A "[c]onstruction of the constitution adopted by the legislative department and long accepted and acquiesced in by the people is entitled to great weight, and in the absence of some showing of palpable error, is to be accepted

Costs of this appeal are taxed to Plaintiffs and their sureties, for which execution may issue if necessary.

as a correct interpretation." *LaFever v. Ware,* 211 Tenn. 393, 365 S.W.2d 44, 47 (1963); *see also Southern Ry. Co. v. Dunn,* 483 S.W.2d 101, 103 (Tenn.1972) ("Since the Legislature twice by its enactments has construed Article 11, section 3, to allow a convention to be convened less than six years after the adjournment of the previous one but more than six years after it was convened, we accept that construction. A holding otherwise might work great mischief."); *Williams v. Carr,* 218 Tenn. 564, 404 S.W.2d 522, 529 (1966); *Derryberry v. State Board of Election Commissioners,* 150 Tenn. 525, 266 S.W. 102, 105 (1924) ("The practical construction of the Legislature, extending over a period of so many years, is entitled to great weight in construing this provision [Article XI, section 3] of our Constitution.").