IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 16, 2017 Session

### ANN CALFEE, ET AL. V. TENNESSEE DEPARTMENT OF TRANSPORTATION, ET AL.

Direct Appeal from the Chancery Court for Davidson County
No. 15-402-I     Claudia Bonnyman, Chancellor

No. M2016-01902-COA-R3-CV

This case involves an attempt by several landowners to challenge a permit issued by the Tennessee Department of Transportation that allowed the placement of water pipelines along two state highways to connect an industrial facility to the Nolichucky River. The trial court dismissed the complaint based on its conclusion that none of the plaintiffs had standing to maintain this action. We reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Elizabeth L. Murphy, Nashville, Tennessee, for the Appellants, Ann Calfee, Don Bible, Jeremiah Cluesman, Ruth Dolin, Jack Renner, and Rueben Stone.

Herbert H. Slatery III, Attorney General and Reporter, and Bruce Michael Butler, Senior Counsel, for the Appellee, Tennessee Department of Transportation.

Michael K. Stagg, Christopher W. Hayes, W. Travis Parham, and Joseph Landon Watson, Nashville, Tennessee, for the Appellee, US Nitrogen, LLC.

Jerry W. Laughlin, Greeneville, Tennesssee, for the Appellee, Industrial Development Board of the Town of Greeneville and Greene County, Tennessee.

## OPINION

### I. FACTS & PROCEDURAL HISTORY[1]

On May 2, 2014, the Tennessee Department of Transportation ("TDOT") received an application for a "Use and Occupancy Permit for Utilities" that would allow two water pipelines to be installed in the highway right-of-way along two state highways in Greene County. The proposed pipelines would run approximately ten miles from an industrial facility to the Nolichucky River. The first pipeline would withdraw water from the Nolichucky River and supply it to the industrial facility, and the second would discharge effluent back to the river. The cover letter enclosed with the application was from US Nitrogen, the chemical production facility that would be served by the pipelines. However, enclosed documents identified the interested party as the Industrial Development Board of the Town of Greeneville and Greene County.

On June 9, 2014, TDOT denied the permit application. As the basis for its denial, TDOT explained that its "Rules and Regulations for Accommodating Utilities Within Highway Rights-of-Way," set forth at Tenn. Comp. R. & Regs. 1680-06-01-.01, *et seq.*, apply to utilities, "which provide essential services to the general public." TDOT concluded that the applicant for the permit "would not provide any public services to the general community." As such, the permit was denied, citing Tennessee Code Annotated section 54-5-802(8)[2] and Tenn. Comp. R. & Reg. 1680-06-01-.01, *et seq*.

After some discussions between TDOT and the Industrial Development Board, TDOT confirmed in a subsequent letter that the original permit application was denied "because it appeared that the proposed pipelines would be for the private use of US Nitrogen and would not provide service to any other businesses or members of the general community." However, according to this letter, TDOT had come to a "new understanding" that the Industrial Development Board would "own and control" the pipelines and make them "available" to serve other customers in addition to US Nitrogen. This letter invited the Industrial Development Board to resubmit the application and "clarify the intent to make these utility services available to the broader public."

On July 18, 2014, the Industrial Development Board resubmitted the application with the stated intention to correct "the mistaken belief that the [Industrial Development

---

[1]Because this case was resolved on a Rule 12.02(6) motion to dismiss, the trial court accepted as true the facts alleged in the Second Amended Complaint. We do the same for purposes of this opinion. The facts recited below are taken from the plaintiffs' Second Amended Complaint.

[2]This referenced statute defines "utility" as "a privately, publicly or cooperatively owned line, facility or system used, available for use or formerly used to transmit or distribute communications, electricity, gas, liquids, steam, sewerage, or other materials to the public." Tenn. Code Ann. § 54-5-802(8).

Board] water project would benefit only US Nitrogen." The second application again noted that the purpose of the project was to intake and discharge water between the Nolichucky River and a water tank located on "the US Nitrogen property footprint." The second application indicated that US Nitrogen would be "the operator of the Pipeline Project for all purposes" under the law and responsible for all costs to design, build, operate, and maintain it. However, the second application described the pipeline project as a "recruiting tool to attract other industry to western Greene County," including two other manufacturers.

On July 31, 2014, TDOT reversed its original position and approved the use and occupancy permit application for the Industrial Development Board. Thereafter, TDOT responded to numerous emails from concerned citizens and explained that the application was approved because the Industrial Development Board certified that it would "own and control" the pipelines and make them "available" to other businesses in addition to US Nitrogen. Several concerned landowners filed a petition for writ of certiorari within sixty days of the issuance of the permit, but it was eventually dismissed for lack of subject matter jurisdiction, as the trial court concluded that the proper way to challenge the permit was by way of a request for a declaratory order from TDOT and a declaratory judgment action under the Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-223, -225.

On March 6, 2015, six landowners submitted a "Petition for Declaratory Order and Injunctive Relief" to TDOT in accordance with Tennessee Code Annotated section 4-5-223(a), which provides, "Any affected person may petition an agency for a declaratory order as to the validity or applicability of a statute, rule or order within the primary jurisdiction of the agency." TDOT did not respond to the petition for a declaratory order. The six petitioners then sought a declaratory judgment in chancery court regarding the validity of the use and occupancy permit, pursuant to Tennessee Code Annotated section 4-5-225, which provides, in pertinent part:

> (a) The legal validity or applicability of a statute, rule or order of an agency to specified circumstances may be determined in a suit for a declaratory judgment in the chancery court of Davidson County, unless otherwise specifically provided by statute, if the court finds that the statute, rule or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the complainant.[3] The agency shall be made a party to the suit.

---

[3]An "order" is defined as "an agency action of particular applicability that determines the legal rights, duties, privileges, immunities or other legal interests of a specific person or persons." Tenn. Code Ann. § 4-5-102(7).

3

(b) A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order and the agency has refused to issue a declaratory order.

In their "Second Amended Complaint," which is controlling for this appeal, the six petitioners alleged that a "Use and Occupancy Permit for Utilities" is reserved for a "utility," pursuant to TDOT Rules and Regulations and Tennessee statutes. Therefore, the petitioners claimed that TDOT exceeded its authority by issuing the use and occupancy permit to the Industrial Development Board and/or US Nitrogen, as neither of those entities is a utility. The Second Amended Complaint noted the representation in the permit application that the Industrial Development Board would "construct, own, and operate" the pipeline system, but according to the complaint, the Industrial Development Board did not in fact own, operate, or maintain the pipelines. In fact, the complaint alleged that the Industrial Development Board would be prohibited by statute from operating any manufacturing, industrial, or commercial enterprise. *See* Tenn. Code Ann. § 7-53-102. The complaint also alleged that TDOT was not authorized to grant a permit as a "corporate recruitment" or "economic development tool" for private water lines that do not deliver goods or services to the public. The petitioners claimed that the permit was void ab initio.

The six petitioners alleged that they are all landowners in East Tennessee who are "directly affected" by the permit in question. Two of the petitioners -- Don Bible and Jack Renner -- own, manage, and reside at large farms that border both the Nolichucky River and Highway 340, where the permit allowed the pipelines to be installed in the highway right-of-way. Mr. Bible had objected in writing to TDOT before the permit was issued to inform TDOT that there was no available or designated right-of-way between the edge of the highway and his private property. According to Mr. Bible, who had lived at the property for fifty years, the highway had "shifted over the years" and "taken up with pavement whatever [right-of-way] was available." Mr. Bible obtained a report of a licensed surveyor and title attorney, and he attached photographs of the edge of his property purporting to show the marked location of an underground telecommunications cable that was previously installed in the right-of-way but that now lies under the pavement. The complaint alleged that presently "there is no right-of-way beyond the edge of the pavement," and only "a 2 foot space" separated the white line on the pavement and the fence running along the edge of his property near the highway. Despite Mr. Bible's objections and no trespassing signs, contractors for US Nitrogen and the Industrial Development Board and representatives of TDOT "came onto the Bible property" with armed security guards, cut his driveway, and installed the pipelines "across Bible property" on the land between the pavement and his fence. Mr. Bible contends that the pipelines "now lie on his private property based on his surveys and deed

4

searches conducted by legal counsel." The complaint alleged that the pipelines were placed there only by the perceived authority of the disputed TDOT permit.

Petitioner Jack Renner owns another large farm along the affected highway. According to the Second Amended Complaint, his property deed showed that his property goes to the edge of the road and that there is no easement or right-of-way beyond the edge of the pavement. Mr. Renner was asked by a representative of the Industrial Development Board if he would grant permission for the pipes to be laid on his property, but he refused. Two weeks later, the pipes were laid "over his farmland." According to the complaint, TDOT was responsible for "managing the Use and Occupancy of the highway [rights-of-way] . . . as well as the construction of utility facilities within those [rights-of-way]."

All six of the petitioners – including Mr. Bible and Mr. Renner – own properties that border the Nolichucky River downstream from the pipelines. According to the Second Amended Complaint:

Plaintiff Ann Calfee is a citizen and resident of Cocke County on Turner Ridge Road. She also owns approximately 1.12 acres of land also in Cocke County on the Nolichucky River, immediately downstream of the pipeline take-out and discharge at the river. Ms. Calfee has riparian rights, and recreational uses that will be particularly and negatively affected by the pipes using the highway right-of-way to locate their water withdrawal and chemical waste discharge just upstream of her property. One of the two pipes will withdraw approximately 2 million gallons of water from the river every day, year round, with no limit for drought conditions. The second pipe will discharge chemical wastewater back to the river. During August of 2014, without the pipes in operation, the Nolichucky River at the proposed withdrawal location was approximately 4.5 feet at its deepest spot, and typically 1-2 feet deep at others. At and above the Calfee property, the riverbed rises atypically, shallowing out into shoals and riffles that are ankle deep in summer and fall seasons. The river widens there and water levels are shallow year round, unlike most other areas of the river. There are no tributary streams between the pipe intake/outflow and the Calfee property to replace the lost flow with anything other than chemical waste. Petitioner Calfee uses the river at her property regularly especially during summer months to fish, recreate with the family and 'float' the river with neighbors and community. The loss of 1-2 million gallons of water immediately upstream will dry the riverbed at the Calfee and other petitioners' properties for the first time in the known history of the area. The loss will be unprecedented and due entirely to locating these industrial

pipes at the river above a particularly shallow stretch of the river, so that the lines can use a public highway right of way. Ms. Calfee and other petitioners have standing because the consequence of the pipe location particularly affects the Calfee property and will have the direct and unusual impact of drying up portions of the river that have never been dry, even in drought conditions. This affect will substantially diminish the Calfee property value by eliminating recreation, fishing, floating and by degrading and heat[ing] the river. It will also stigmatize that location as "dry" or "polluted from the pipes." But for the grant of the Occupancy Permit, the withdrawal and effluent pipes would not affect the Calfee and other petitioners' properties because it would not be at that location.

Two other petitioners were neighbors to Ms. Calfee and claimed that these factual allegations applied equally to their property. A fourth petitioner owned land on the Nolichucky River located "several miles" downstream from the pipelines, but the complaint alleged that his riparian rights and recreational uses would likewise be "particularly and negatively affected by the daily withdrawal of approximately 1-2 million gallons of water year round, with no limit for drought conditions . . . combined with chemical wastewater discharge." Mr. Bible and Mr. Renner claimed similar recreational uses and also used the river for irrigation. They suggested that the river would no longer be usable for that purpose because the contents of the industrial discharge could not be known to the local farmers. In sum, the Second Amended Complaint alleged that all of the petitioners had standing and were "affected" within the meaning of Tennessee Code Annotated section 4-5-225, in that they would suffer or had already suffered direct impacts to their property as a result of the permit issued by TDOT. The petitioners alleged that the installation of the pipelines resulted in permanent injury and encroachment on the Bible and Renner properties and would create a permanent nuisance to the downstream petitioners. They sought a declaration that the permit was void and an injunction precluding the use of the permit.

TDOT filed a motion to dismiss, asserting that the petitioners' complaint had not alleged sufficient facts to demonstrate that they had standing to bring their complaint for declaratory judgment. TDOT argued that the landowners alongside the river and those along the highway (1) had not suffered any type of distinct and palpable injuries, (2) could not show a causal connection between the granting of the permit and their alleged injuries, and (3) could not demonstrate that their alleged injuries were capable of being redressed by the trial court. The Industrial Development Board and US Nitrogen were permitted to intervene and filed a joint motion to dismiss also asserting a lack of standing.

After a hearing, the trial court entered an order granting the motions to dismiss for lack of standing. Assuming that the facts alleged in the Second Amended Complaint

were true, the trial court found that none of the six petitioners had standing because "(1) the Petitioners have not experienced any direct injury due to the issuance of the permit by TDOT; (2) no causal connection exists between the issuance of the permit and the injuries alleged by the Petitioners; and (3) the Petitioners' alleged injuries cannot be redressed by revoking the permit." The petitioners timely filed a motion to alter or amend, which was denied. They timely filed a notice of appeal to this Court on September 9, 2016.

## II. ISSUES PRESENTED

The petitioners raise the following issue for review on appeal:

1.      Whether the petitioners have standing based on their allegations of particularized injuries, a causal connection between the injuries and the challenged action, and a claim that is redressable with a favorable ruling.

For the following reasons, we reverse the decision of the chancery court and remand for further proceedings.

## III. STANDARD OF REVIEW

"'Lack of standing may be raised as a defense in a Tennessee Rule of Civil Procedure 12.02(6) motion to dismiss.'" *Lovett v. Lynch*, No. M2016-00680-COA-R3-CV, 2016 WL 7166407, at *4 (Tenn. Ct. App. Dec. 8, 2016) (*no perm. app. filed*) (quoting *Dubis v. Loyd*, No. W2015-02192-COA-R3-CV, 2016 WL 4371786, at *3 (Tenn. Ct. App. Aug. 15, 2016) (*no perm. app. filed*)). The purpose of such a motion is to test the legal sufficiency of the complaint, not the strength of the petitioners' proof. *Lovett*, 2016 WL 7166407, at *4. The complaint need not contain detailed allegations of all of the facts giving rise to the claim, but it must contain sufficient factual allegations to articulate a claim for relief. *Id.* "'We must liberally construe the pleadings, presuming all factual allegations are true and drawing all reasonable inferences in favor of the complainant.'" *Id.* (quoting *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011)).

The issue of whether a party has standing to maintain an action is a question of law. *Id.* at *5. As such, our review is de novo with no presumption of correctness accompanying the trial court's conclusion. *Id.* "When we address standing based solely on the pleadings, we must accept the allegations of fact as true, however, inferences to be drawn from the facts or legal conclusions set forth in the complaint are not required to be taken as true." *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 867 n.20 (Tenn. 2016) (internal quotation omitted).

7

## IV. DISCUSSION

As noted above, Tennessee Code Annotated section 4-5-223(a) provides that "[a]ny affected person" can petition an agency for a declaratory order as to the validity or applicability of a statute, rule, or order within the primary jurisdiction of the agency.[4] The agency can convene a contested case hearing and issue a declaratory order, which is subject to judicial review in the manner provided for contested cases. Tenn. Code Ann. § 4-5-223(a)(1). Alternatively, the agency can refuse to issue a declaratory order, in which case the petitioner can seek a declaratory judgment in chancery court.[5] Tenn. Code Ann. § 4-5-223(a)(2).

If the agency does not set an administrative petition for a declaratory order for a contested case hearing within sixty days, it is deemed to have denied the petition and refused to issue a declaratory order. Tenn. Code Ann. § 4-5-223(c). That is what happened in this case. As a result, the petitioners were entitled to seek a judicial

---

[4]The appellees – TDOT, US Nitrogen, and the Industrial Development Board – do not argue and the trial court did not find that these petitioners are not "affected" persons within the meaning of the Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-223, -225.

[5]The declaratory judgment action is "distinct from" the administrative proceeding in which the affected person petitioned the agency for a declaratory order. *Nonprofit Hous. Corp. v. Tenn. Hous. Dev. Agency*, No. M2014-01588-COA-R3-CV, 2015 WL 5096181, at *3 n.4 (Tenn. Ct. App. Aug. 27, 2015) (*no perm. app. filed*); *see also Pickard v. Tenn. Dep't of Env't & Conservation*, No. M2011-01172-COA-R3-CV, 2012 WL 3329618, at *10 (Tenn. Ct. App. Aug. 14, 2012) (explaining that the "proper procedure" is to file "an original action for a declaratory judgment" stating that the Board refused to issue a declaratory order).

We also note that under the Uniform Administrative Procedures Act, "there are fundamental differences between an original action for a declaratory judgment [pursuant to section 4-5-225] and a petition to review the final order of an administrative agency in a contested case [pursuant to 4-5-322]." *Taylor v. Reynolds*, No. 93-552-I, 1994 WL 256286, at *2 (Tenn. Ct. App. June 10, 1994). "The two types of actions are governed by different statutory provisions that are codified in different parts of the APA, by different procedures, and by different scopes of trial court decision-making." *Castro v. Peace Officer Standards & Training Comm'n*, No. M2006-02251-COA-R3-CV, 2008 WL 3343000, at *5 (Tenn. Ct. App. Aug. 11, 2008).

> In the original [declaratory judgment] action, the chancellor will be the judge of the law and the facts. In the contested case review, the facts are taken from the agency's findings--if they are supported by substantial and material evidence. *See* Tenn. Code Ann. § 4-5-322(h)(5). The original action is employed to establish legal rights; the review petition is employed to ensure the essential legality of the administrative proceeding. So, the results sought are not the same.

*Taylor*, 1994 WL 256286, at *2. Also, on appeal, this Court reviews a trial court's decision in a declaratory judgment action filed pursuant to section 4-5-225 using the standard of review generally applicable to civil cases set forth in Tennessee Rule of Appellate Procedure 13(d). *Owens v. State Bd. of Architectural & Eng'g Examiners*, No. 87-332-II, 1988 WL 30176, at *2 (Tenn. Ct. App. Mar. 30, 1988).

determination of their concerns by instituting a suit for declaratory judgment pursuant to section 4-5-225(a), which provides:

> The legal validity or applicability of a statute, rule or order of an agency to specified circumstances may be determined in a suit for a declaratory judgment in the chancery court of Davidson County, unless otherwise specifically provided by statute, if the court finds that the statute, rule or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the complainant. The agency shall be made a party to the suit.

*Id.* "Thus, under the Administrative Procedures Act, a court may issue a declaratory judgment if an 'affected person' seeks that relief and if the rule or order, or its application, interferes with, impairs, or threatens to interfere with the person's rights." *Boles v. Tenn. Dep't of Corr.*, No. M2000-00893-COA-R3-CV, 2001 WL 840283, at *2 (Tenn. Ct. App. July 26, 2001); *see also Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 456 (Tenn. 1995) ("The Administrative Procedures Act [] allows an 'affected person' to petition the Davidson County Chancery Court for a declaratory judgment regarding the legal validity of a statute, rule, or agency order in limited circumstances."). Persons seeking a declaratory judgment pursuant to section 4-5-225 must allege that a private interest or personal right has been affected by the enforcement of a statute, rule, or order. *Reid v. Lutche*, No. M1997-00229-COA-R3-CV, 2001 WL 55783, at *4 (Tenn. Ct. App. Jan. 24, 2001).

"Standing is a prerequisite to an action for declaratory judgment, including a petition filed pursuant to the Administrative Procedures Act." *Boles*, 2001 WL 840283, at *2 (citing *Tenn. Med. Ass'n v. Corker*, No. 01A01-9410-CH00494, 1995 WL 228681 at *1 (Tenn. Ct. App. Apr. 19, 1995)). "'A person challenging the actions of an administrative agency must satisfy the requirements of standing to sue.'" *Thomas v. Tenn. Dep't of Transp.*, No. M2010-01925-COA-R3-CV, 2011 WL 3433015, at *6 (Tenn. Ct. App. Aug. 5, 2011) (quoting *Tenn. Envt'l Council v. Solid Waste Disposal Control Bd.*, 852 S.W.2d 893, 896 (Tenn. Ct. App. 1992)). Standing is a judge-made doctrine that is used to refuse to determine the merits of a legal controversy irrespective of its correctness where the party advancing it is not properly situated to prosecute the action. *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976). It requires us to determine "'whether a party has a sufficiently personal stake in a matter'" to warrant judicial resolution of the dispute. *Metro. Gov't of Nashville v. Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 755 (Tenn. 2015) (quoting *State v. Harrison*, 270 S.W.3d 21, 27-28 (Tenn. 2008)). "'Persons whose rights or interests have not been affected have no standing and are, therefore, not entitled to judicial relief.'" *Id.* (quoting *Harrison*, 270 S.W.3d at 27-28).

We do not consider the likelihood of the plaintiff's success on the merits in determining whether the plaintiff has standing. *Id.* Still, the standing inquiry requires careful judicial examination of the allegations of the complaint to ascertain whether the petitioner is "entitled to an adjudication" of the particular claims asserted. *Am. Civil Liberties Union of Tenn. v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006). Basically, the standing inquiry focuses on the party rather than the merits of the claim asserted. *Town of Collierville v. Town of Collierville Bd. of Zoning Appeals*, No. W2013-02752-COA-R3-CV, 2015 WL 1606712, at *4 (Tenn. Ct. App. Apr. 7, 2015), *perm. app. denied* (Tenn. Nov. 24, 2015). "Constitutional standing, the issue in this case, is one of the 'irreducible . . . minimum' requirements that a party must meet in order to present a justiciable controversy." *City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In order to establish constitutional standing, a petitioner must satisfy three indispensable elements. *Id.*

> First, a party must show an injury that is 'distinct and palpable'; injuries that are conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry are insufficient in this regard. Second, a party must demonstrate a causal connection between the alleged injury and the challenged conduct. While the causation element is not onerous, it does require a showing that the injury to a plaintiff is 'fairly traceable' to the conduct of the adverse party. The third and final element is that the injury must be capable of being redressed by a favorable decision of the court.

*Hargett*, 414 S.W.3d at 98 (citations and quotations omitted).

In the case before us, the six petitioners assert that they are all landowners who were directly "affected" by the TDOT use and occupancy permit at issue within the meaning of the Uniform Administrative Procedures Act. The petitioners also assert two different types of interests and injuries in their attempt to demonstrate standing. Mr. Bible and Mr. Renner – the two farmers alongside the highway – claim injuries to their properties from the installation of the pipelines in the ground. All six landowners also assert injuries to their properties and rights to use and enjoy the river due to the location where the pipelines withdraw and discharge water. We will address these two types of alleged injuries separately in order to determine whether the petitioners met the three elements of standing for each.

10

## A. The Landowners Beside the Road

Again, according to the Second Amended Complaint, Mr. Bible and Mr. Renner own, manage, and reside at large farms alongside the state highway where TDOT permitted the Industrial Development Board and/or US Nitrogen to install the pipelines. Mr. Bible objected in writing to TDOT before the use and occupancy permit was granted to notify TDOT that "there was no available or designated [right-of-way] between the edge of the road and his private property because the highway was shifted over the years and ha[d] taken up with pavement whatever [right-of-way] was available." According to the complaint, Mr. Bible has lived at his farm for fifty years, and his mailbox and farm fence are now located only two feet from the edge of the highway. The complaint indicates that he obtained the report of a licensed surveyor and title attorney. Despite notice of Mr. Bible's objections and his posting of no trespassing signs, representatives of TDOT "came onto the Bible property" with contractors for US Nitrogen and the Industrial Development Board "and laid the dual pipelines across Bible property with armed security guards." Mr. Bible's driveway was cut, and the pipelines were installed on the property between the pavement and the fence that he claims belongs to him.

Mr. Renner similarly claimed that no easement or right-of-way existed beyond the edge of the pavement bordering his property. According to the complaint, his deed shows that the Renner property "goes to the edge of the road." The complaint alleges that "[c]onstruction crews under the supervision of TDOT" laid the disputed pipelines "across farmland belonging to Petitioners Renner and Bible." Requests were made to counsel for TDOT to cease the work on those properties because of the dispute regarding the existence of any right-of-way at those locations. According to the complaint, counsel for TDOT responded that TDOT claimed "no responsibility on that issue" because TDOT made it "clear" to the Industrial Development Board that it would be its responsibility to verify the location of the right-of-way line. The work continued, and "Mr. Bible contends that the pipes now lie on his private property based on his surveys and deed searches conducted by legal counsel in Greene County." Mr. Renner similarly believes that the pipelines were laid "over his farmland."

### 1. Distinct and Palpable Injury

"'The sort of distinct and palpable injury that will create standing must be an injury to a recognized legal right or interest.'" *Metro. Gov't of Nashville*, 477 S.W.3d at 755 (quoting *Harrison*, 270 S.W.3d at 27-28). The plaintiff must suffer an "injury in fact," meaning an invasion of a legally protected interest that is "concrete and

11

particularized" and "actual or imminent," but not "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotations omitted). Courts must ask, "'Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?'" *Darnell*, 195 S.W.3d at 620-21 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)).

In the trial court's order granting the motion to dismiss for lack of standing, the court found that "Petitioners have not experienced any direct injury due to the issuance of the permit by TDOT." We respectfully disagree. Mr. Bible and Mr. Renner have alleged particularized, distinct, and palpable injuries to their properties that are not conjectural or hypothetical, nor are they common to the public generally. We have previously recognized that "[a]n abutting landowner has a greater interest in a road than a member of the general public." *Gonzalez v. Armistead*, No. M2006-02643-COA-R3-CV, 2008 WL 933489, at *1 (Tenn. Ct. App. Apr. 7, 2008) (citing *Knierim*, 542 S.W.2d at 810). As the Tennessee Supreme Court observed in *Knierim*, "'An abutting owner has two distinct kinds of rights in a highway, a public right which he enjoys in common with all other citizens, and certain private rights which arise from his ownership of property contiguous to the highway, and which are not common to the public generally[.]'" *Knierim*, 542 S.W.2d at 810-11 (quoting *Current v. Stevenson*, 116 S.W.2d 1026 (Tenn. 1938)). The same can be said of a landowner who owns property abutting a highway *and its disputed right-of-way*. Mr. Bible and Mr. Renner do not assert some generalized grievance about the placement of private water lines in a distant state highway right-of-way. Mr. Bible and Mr. Renner allege that TDOT approved a permit allowing the installation of pipelines alongside the highway beside their properties and within the highway right-of-way despite actual knowledge of their position that no right-of-way exists at that particular location. As a result, they claim that the pipelines were wrongfully placed outside of any right-of-way, "across farmland belonging to Petitioners Renner and Bible," resulting in a permanent encroachment on their properties. This is a distinct and palpable injury sufficient to establish the first element of standing.

### 2. A Causal Connection

The second element of standing requires "a causal connection" between the challenged conduct and the alleged injury. *Hargett*, 414 S.W.3d at 98. "While the causation element is not onerous, it does require a showing that the injury to a plaintiff is 'fairly traceable' to the conduct of the adverse party." *Id.* (quoting *Darnell*, 195 S.W.3d at 620). The injury must not be the result of "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation omitted). When analyzing this element, courts should inquire as to whether "'the line of causation between the illegal conduct and injury [is] too attenuated.'" *Darnell*, 195 S.W.3d at 621 (quoting *Allen*, 468 U.S. at 752).

12

The trial court concluded that "no causal connection exists between the issuance of the permit and the injuries alleged by the Petitioners." The court reasoned that "the permit did not cause the property injury to Mr. Renner and Mr. Bible," because if any trespass occurred, it was caused by "the pipeline contractors." The trial court concluded that the alleged trespass or encroachment on the farmers' land was too "attenuated from the permit" because the permit only authorized the placement of pipelines in the highway right-of-way, not on private land. The court found that if there was a trespass, "it was not caused by the permit but by a mistake or a bad judgment call." We respectfully disagree with the court's characterization of the facts. Taking the facts alleged by the petitioners as true, TDOT approved a permit for installation of pipelines alongside the highway adjacent to petitioners' property despite knowledge of the fact that, according to Mr. Bible and Mr. Renner, no right-of-way exists at that particular location. The facts alleged by the petitioners do not paint a picture whereby TDOT innocently and appropriately issued a permit and the contractors simply exceeded its scope. Instead, the petitioners allege that TDOT's decision to issue the permit with knowledge of the absence of a right-of-way directly caused the installation of the pipeline on private property. The complaint alleges that TDOT is responsible for "the construction of utility facilities within [the right-of-way]" but that it claimed "no responsibility" to verify the existence of a right-of-way in this case. Consequently, the petitioners' claimed injury was not the result of "independent action of some third party not before the court," *Lujan*, 504 U.S. at 560, and "the line of causation" between the permit and the claimed injury is not too attenuated. *Darnell*, 195 S.W.3d at 621. The facts alleged in the case before us demonstrate a fairly traceable and sufficient causal connection between the claimed injuries of Mr. Renner and Mr. Bible and the challenged permit.

### 3. Redressability

"The third and final element is that the injury must be capable of being redressed by a favorable decision of the court." *Hargett*, 414 S.W.3d at 98. This requires an injury "apt to be redressed by a remedy that the court is prepared to give." *City of Chattanooga v. Davis*, 54 S.W.3d 248, 280 (Tenn. 2001). We must consider whether "'the prospect of obtaining relief from the injury as a result of a favorable ruling [is] too speculative.'" *Darnell*, 195 S.W.3d at 621 (quoting *Allen*, 468 U.S. at 752). Stated differently, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560. The trial court found, generally, that "the Petitioners' alleged injuries cannot be redressed by revoking the permit." In our view, however, Mr. Bible and Mr. Renner have established that their injuries are subject to redress by the courts. They seek a declaratory judgment regarding the legality of the permit and a permanent injunction precluding use of the permit. A favorable decision in this case is capable of redressing their specific injuries.

13

## B. The Landowners Along the River

As noted above, all six petitioners claim that they have standing to pursue this action for declaratory judgment due to their status as landowners who own property on the Nolichucky River downstream of the pipelines and who claim that their use of the river will be adversely affected by the withdrawal and discharge of water at that location for use of the industrial facilities.

### 1. Distinct and Palpable Injury

Again, the first element we examine is whether the plaintiffs have demonstrated a distinct and palpable injury. *Darnell*, 195 S.W.3d at 620. The trial court concluded that these particular petitioners "have not experienced any direct injury" in relation to their water rights, as their claims regarding the decrease in water level and the diminished quality of the water "are the same claims that anyone *on the river* could experience or affect." (Emphasis added.) However, the fact that other landowners *on the river* could potentially assert similar claims does not prevent the petitioners from having a distinct and palpable injury sufficient to confer standing.

A "distinct and palpable injury" means one "that is not common to the public generally." *Deselm v. Tenn. Peace Officers Standards & Training Comm'n*, No. M2009-01525-COA-R3-CV, 2010 WL 3959627, at *25 (Tenn. Ct. App. Oct. 8, 2010). "The essential element of standing is an allegation that the challenged act will inflict some injury on the complainant not common to the body of citizenry." *Howe v. Haslam*, No. M2013-01790-COA-R3-CV, 2014 WL 5698877, at *18 (Tenn. Ct. App. Nov. 4, 2014) (quotation omitted). "'In determining whether the plaintiff has a personal stake sufficient to confer standing, the focus should be on whether the complaining party has alleged an injury in fact, economic or otherwise, which distinguishes that party, in relation to the alleged violations, from the undifferentiated mass of the public.'" *Durham v. Haslam*, No. M2014-02404-COA-R3-CV, 2016 WL 1301035, at *5 (Tenn. Ct. App. Apr. 1, 2016), *perm. app. denied* (Tenn. July 21, 2016) (quoting *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001)). "The injury must be distinct from an injury shared with 'the public at large.'" *Chapman v. Shelby Cnty. Gov't*, No. W2012-02223-COA-R3-CV, 2013 WL 3155211, at *2 (Tenn. Ct. App. June 20, 2013) (quoting *Mayhew*, 46 S.W.3d at 768). An injury that is "predicated upon an interest that a litigant shares in common with the general citizenry" is insufficient. *Hargett*, 414 S.W.3d at 98. Otherwise, the State would be required to defend against "a profusion of lawsuits" from taxpayers and citizens. *Darnell*, 195 S.W.3d at 620. *See, e.g., City of Chattanooga*, 54 S.W.3d at 280

(finding no standing where the appellant's interest was "indistinguishable from that possessed by the public at large").

Here, the petitioners have alleged injuries that are "distinct from that of the general public." *Chapman*, 2013 WL 3155211, at *4. According to the Second Amended Complaint, Ms. Calfee owns property on the Nolichucky River "immediately downstream of the pipeline take-out and discharge" and will be particularly and negatively affected in her riparian rights and recreational uses by the pipes withdrawing water and discharging chemical waste "just upstream of her property." The pipes will withdraw approximately 2 million gallons of water from the river every day year round even in drought conditions, and the river was typically only ankle deep in the summer and fall seasons at the Calfee property before the pipelines were installed due to its location where the riverbed rises "atypically" and widens and shallows "unlike most other areas of the river." There are no tributaries between the pipelines and the Calfee property to replace the lost flow. According to the complaint, the placement of the pipelines and withdrawal of approximately 2 million gallons of water above this "particularly shallow stretch of the river" will dry portions of the riverbed at the Calfee and other petitioners' properties. Two other petitioners are neighbors to Ms. Calfee, and another lives "several miles" from the pipelines but also downstream. The complaint alleges that Ms. Calfee and the other petitioners use the river regularly for fishing, floating, and recreation, and they assert that these uses will be negatively impacted or eliminated. They also claim that their property values will be substantially diminished. Mr. Bible and Mr. Renner use the river for irrigation and assert that they will no longer be able to do so because they cannot know the content of the industrial discharge from the pipelines. These are distinct and palpable injuries not shared with the public at large.

On appeal, the Industrial Development Board and US Nitrogen argue that the petitioners' complaint contains only "baseless theoretical fears" about the volume and quality of the water and their property values, which do not give rise to a particularized concrete injury. When the Second Amended Complaint was filed, the pipelines had already been installed but were not yet in operation.[6] However, as we said before, the standing analysis requires an invasion of a legally protected interest that is "concrete and particularized" and "actual *or imminent*, but not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (emphasis added). The injury complained of must be "if not actual, then at least *imminent*." *Id.* at 564 n.2. "In other words, the harm must have already occurred or it must be likely to occur 'imminently.'" *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (citing *Lujan*, 504 U.S. at 560). "Although 'imminence' is concededly a somewhat elastic concept," requiring it to be demonstrated is meant "to

---

[6]The brief jointly filed by the Industrial Development Board and US Nitrogen states that the pipelines are now in operation.

15

ensure that the alleged injury is not too speculative" and "that the injury is '*certainly* impending[.]'" *Lujan*, 504 U.S. at 564 n.2. When cases "involve *actual* harm; the existence of standing is clear, though the precise extent of harm remains to be determined at trial. Where there is no actual harm, however, its imminence (though not its precise extent) must be established." *Id.*

Moreover, the statute authorizing this declaratory judgment action provides that the chancery court may determine the legal validity of an agency order if the court finds that the "order, or its threatened application, interferes with or impairs, *or threatens to interfere with or impair*, the legal rights or privileges of the complainant." Tenn. Code Ann. § 4-5-225 (emphasis added). "These proceedings enable parties whose rights are at stake to invoke the aid of the courts to remove uncertainty from their legal relations and, thus, to clarify and stabilize these rights before irretrievable, or at least prejudicial, acts are taken." *Reid*, 2001 WL 55783, at *3. The plaintiff is required to show that he or she "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Town of Collierville*, 2015 WL 1606712, at *4. Liberally construing the complaint, taking the petitioners' factual allegations as true, and giving them the benefit of all reasonable inferences, we conclude that they have sufficiently alleged that the TDOT permit allowing the pipelines at this particular location "threatens to interfere" with their legal rights or privileges, *see* Tenn. Code Ann. § 4-5-225, and constitutes a sufficiently real and concrete "imminent" invasion of a legally protected interest sufficient to confer standing. *Lujan*, 504 U.S. at 560; *see also Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836-37 (Tenn. 2008) (explaining that "a plaintiff in a declaratory judgment action need not show a present injury" and that declaratory judgment actions serve as "a proactive means of preventing injury to the legal interests and rights of a litigant").

## 2. A Causal Connection

The second element requires "the existence of a 'fairly traceable' connection between the alleged injury and the challenged conduct." *Darnell*, 195 S.W.3d at 620. As stated above, the trial court found "no causal connection" between the issuance of the permit and the petitioners' claimed injuries. The chancellor reasoned that the petitioners' "water claims" regarding the degradation of the water were not "causally connected" to the permit granting the Industrial Development Board the ability to lay the pipelines in the highway right-of-way. On appeal, the appellees maintain that the petitioners' claimed injuries were not caused by the TDOT use and occupancy permit allowing the pipelines to be installed at this location, but rather by other permits from other agencies that approved the actual withdrawal and return of water within the pipelines. We are not

16

persuaded.

Again, in the standing analysis, "the causation element is not onerous." *Hargett*, 414 S.W.3d at 98. The fact that other permits were also necessary for this project does not preclude the petitioners from challenging this particular permit if it was wrongfully issued. The petitioners' complaint alleges that their injuries are "due entirely to locating these industrial pipes at the river above a particularly shallow stretch of the river, so that the lines can use a public highway right of way." They allege, "But for the grant of the Occupancy Permit, the withdrawal and effluent pipes would not affect the Calfee and other petitioners' properties because it would not be at that location." Because the petitioners allege that the pipelines "would not discharge at that location but for the [right-of-way] permit," we conclude that they have alleged a sufficient fairly traceable causal connection between the challenged conduct and the claimed injury, and "the line of causation between the illegal conduct and injury" is not too attenuated. *Darnell*, 195 S.W.3d at 621.

### 3. Redressability

Finally, we consider whether the injury is "capable of being redressed by a favorable decision of the court." *Hargett*, 414 S.W.3d at 98. We must consider whether "the prospect of obtaining relief from the injury as a result of a favorable ruling [is] too speculative." *Darnell*, 195 S.W.3d at 621. "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. The trial court found that the petitioners' alleged injuries "cannot be redressed by revoking the permit" or declaring the permit invalid, "given the defendants' argument that the water can be withdrawn by other means." On appeal, the Industrial Development Board and US Nitrogen maintain that even without the TDOT permit, they "would have other means by which to withdraw water from the Nolichucky River." TDOT likewise suggests that if a court strikes down the use and occupancy permit, "that would not prevent the Industrial Development Board from withdrawing or returning the water" because it "could create another route for the water pipelines across private property" or use tanker trucks to transport the water. However, these arguments overlook the petitioners' claim that they are injured by the placement of these pipelines *at this particular location* just upstream of their properties where the river is atypically shallow and lacks tributaries. If the trial court were to declare the use and occupancy permit invalid and enjoin its use, so that the Industrial Development Board was forced to create "another route . . . across private property" or develop "other means" of transporting the water, it is likely that the petitioners' injuries would be redressed, based on the allegations of their complaint.

## V. CONCLUSION

For the aforementioned reasons, we conclude that these six petitioners have alleged distinct and palpable injuries fairly traceable to the allegedly unlawful permit and likely to be redressed by the requested relief. They are affected persons within the meaning of the Uniform Administrative Procedures Act. We therefore conclude that they have standing to pursue this action for declaratory judgment. The decision of the chancery court is hereby reversed and remanded for further proceedings. Costs of this appeal are taxed to the appellees, the Tennessee Department of Transportation, US Nitrogen, LLC, and the Industrial Development Board of the Town of Greeneville and Greene County, Tennessee, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE