IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 6, 2023 Session

**TERRY CASE v. WILMINGTON TRUST, N.A. ET AL.**

**Appeal by Permission from the Court of Appeals
Chancery Court for Hamilton County
No. 20-0144  Jeffrey M. Atherton, Chancellor**

———————————————————

**No. E2021-00378-SC-R11-CV**

———————————————————

Plaintiff Terry Case did not make his mortgage payments for several years.  The real property which secured his loan was subsequently sold at a foreclosure sale following the postponement of a prior sale date.  Mr. Case brought a claim for "wrongful foreclosure," among others, alleging Defendants Wilmington Trust, N.A. and Wilson & Associates, PLLC violated the notice requirements in the applicable deed of trust by failing to provide him with written notice of the postponement.  The trial court granted summary judgment to Defendants, and Mr. Case solely appealed the dismissal of his claim for "wrongful foreclosure."  The Court of Appeals reversed, finding that Defendants failed to satisfy their notice obligations under the deed of trust and that summary judgment on the claim for "wrongful foreclosure" was therefore inappropriate.  Defendant Wilmington Trust applied for permission to appeal to this Court, and we granted review to determine (1) whether Tennessee recognizes a common law cause of action for "wrongful foreclosure," and (2) whether the Fannie Mae/Freddie Mac Uniform Deed of Trust requires written notice of postponement in addition to oral announcement pursuant to section 35-5-101(f) of the Tennessee Code.  We further instructed the parties to address whether Mr. Case satisfied the requirements for constitutional standing.  We hold that Mr. Case has constitutional standing to bring his claim.  However, we also hold that there is no common law cause of action for "wrongful foreclosure" in Tennessee.  As a result, we reverse the judgment of the Court of Appeals and remand to the trial court for entry of an order consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed; Remanded to the Trial Court**

DWIGHT E. TARWATER, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, ROGER A. PAGE, and SARAH K. CAMPBELL, JJ., joined.  HOLLY KIRBY, C.J., filed a separate opinion concurring in the judgment.

J. Hunter Robinson, Virginia N. Adamson, and Alex McFall, Nashville, Tennessee, for the appellant, Wilmington Trust, N.A., as Trustee for MFRA Trust 2014-2.

Buddy B. Presley, Jr. and Terrance L. Jones, Chattanooga, Tennessee, for the appellee, Terry Case.

David M. Anthony, Nashville, Tennessee, for the Amici Curiae, Tennessee Bankers Association and Tennessee Mortgage Bankers Association.

## OPINION

### I.   FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from a mortgage in default.  On or about July 26, 2007, Terry Case ("Mr. Case" or "Appellee") obtained a $572,500.00 mortgage loan from Suntrust Mortgage, Inc. ("Suntrust").  The mortgage was secured by a deed of trust ("Deed of Trust") on property located in Hamilton County, and the Deed of Trust was ultimately assigned to Wilmington Trust National Association as Trustee for MFRA Trust 2014-2 ("Wilmington").  In 2013, Mr. Case stopped making payments on the loan.  Taking full advantage of the automatic stay provisions under federal bankruptcy law, he filed eight separate bankruptcy petitions in less than a decade (five of which came from July 2013 to 2019), impairing Wilmington's ability to foreclose without court approval.

Wilmington was finally granted leave to foreclose on the property and appointed Wilson & Associates, PLLC ("Wilson," collectively with Wilmington, "Defendants") as substitute trustee under the Deed of Trust to pursue the foreclosure and sale.  Wilson prepared the notice of trustee's sale ("Notice of Sale"), which was sent to Mr. Case and advertised on January 21, 2020.  At that time, Mr. Case owed over $851,000.00 on the loan.  The sale was scheduled for February 24, 2020.  There is no dispute this notice complied with applicable statutes governing foreclosure sales.

Five days before the scheduled foreclosure sale, Mr. Case filed suit in Hamilton County Chancery Court, naming Barclays Bank, PLC ("Barclays") and Wilson as defendants and moved for a temporary restraining order to prevent the foreclosure sale pursuant to Tennessee Rule of Civil Procedure 65.  The court granted the temporary restraining order and set a hearing for March 4, 2020.

Having been temporarily restrained, a representative from Wilson orally announced the sale's postponement at the date, time, and place of the original sale pursuant to section 35-5-101 of the Tennessee Code.  The sale was postponed twenty-eight days until March

23, 2020. Neither Mr. Case nor his counsel was present to hear the oral announcement of the postponement. On March 4, 2020, just eight days later, Mr. Case's counsel did not appear at the hearing on the temporary restraining order, which was then dissolved. The record is unclear whether Mr. Case was present for the hearing.

On March 23, 2020, the property was sold at the postponed foreclosure sale at the date, time, and place stated in the oral announcement. Neither Mr. Case nor his counsel was present at the auction.

Mr. Case filed an amended complaint on July 13, 2020, substituting Wilmington for Barclays and asserting claims for "wrongful foreclosure," breach of contract, slander of title, and to quiet title. He claimed that Wilmington and Wilson wrongfully foreclosed the property by failing to give him written notice of the postponed sale pursuant to the terms of the Notice of Sale. The relevant provision in the Notice of Sale stated:

> The sale held pursuant to this Notice may be rescinded at the Successor Trustee's option at any time. The right is reserved to adjourn the day of the sale to another day, time, and place certain without further publication, upon announcement at the time and place for the sale set forth above. In the event of inclement weather, the trustee hereby announces that the sale will be postponed for a period of two weeks. *In such situations, notices will be mailed to interested parties of record.*

(Emphasis added). Mr. Case claimed the last sentence imposed a written notice requirement for all postponements.

Defendants disagreed and filed motions to dismiss for failure to state a claim pursuant to Tennessee Rule of Civil Procedure 12.02(6), arguing the last sentence only applied when a sale is postponed due to inclement weather; therefore, they were not required to provide Mr. Case written notice. The trial court dismissed Mr. Case's claims for slander of title and to quiet title and denied the motions to dismiss with respect to the remaining claims.

After discovery, Defendants individually moved for summary judgment on the two remaining claims: breach of contract and wrongful foreclosure. The trial court granted Defendants' motions for summary judgment, finding Mr. Case's claims of breach of contract and wrongful foreclosure without merit, providing specifically that "Plaintiff has not set forth any evidence that Wilmington or Wilson breached the Deed of Trust or that Plaintiff suffered any damages as a result of the purported breach." The trial court entered a judgment in the Defendants' favor on all remaining counts.

Mr. Case appealed, solely challenging the dismissal of the wrongful foreclosure claim. He argued the trial court erred in granting the motion for summary judgment because Defendants (1) failed to provide written notice of the foreclosure sale's postponement and (2) failed to properly identify the location of the foreclosure sale in its Notice of Sale.[1] *Case v. Wilmington Trust, N.A.*, No. E2021-00378-COA-R3-CV, 2022 WL 2313548, at *4 (Tenn. Ct. App. June 28, 2022), *perm. app. granted*, (Tenn. Jan. 5, 2023). Mr. Case did not appeal the trial court's dismissal of his breach of contract claim.[2] *Id.*

The appellate court quickly dealt with the alleged inadequacy of the foreclosure sale's location, writing that Mr. Case "provide[d] no argument or legal authority to support his contention that 'the Hamilton County Courthouse' provided him with an inadequate description or identification of the place of the sale." *Id.* at *6.

The court then moved on to the issue of written notice and reversed the lower court's order granting Defendants' motions for summary judgment, holding the Notice of Sale, incorporated into the Deed of Trust, required Defendants to provide written notice of the sale's postponement. *Id.* at *14. The court first evaluated the Deed of Trust's notice provision in Section 15, which reads in part: "[a]ll notices given by Buyer or Lender in connection with this Security Instrument must be in writing . . . . If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument."[3] The court held that the Applicable Law provision was not triggered because written notice of postponement was not required by section 35-5-101(f) of the Tennessee Code. *Id.* at *12. The court next analyzed the Notice of Sale and found that the ordinary meaning of its last sentence included a written notice requirement:

> The notice provision is not connected to the inclement weather provision by a semi-colon and does not otherwise indicate that it is only applicable to the scenario in the preceding sentence. The more natural reading of the notice provision is to read it in light of the last paragraph as a whole and to read the

---

[1] Defendant Wilmington raised several other issues regarding waiver and attorneys' fees in the Court of Appeals. *Id.* The appellate court's holding regarding these issues was not raised in appellant's Rule 11 application. Therefore, we need not address those issues in this appeal.

[2] Mr. Case confirmed during oral argument in this Court that he had not appealed the trial court's dismissal of the breach of contract claim.

[3] By its own definition, "Applicable Law" in the Deed of Trust included Tennessee law.

notice provision as applying to all three of the listed situations in which the sale does not occur. [4]

*Id.* Based on its interpretation of section 35-5-101(f) of the Tennessee Code and the Notice of Sale, the court held that the lack of written notice was a breach of the Deed of Trust. *Id.* at \*14. As a result, the Court of Appeals reversed the trial court's order granting Defendants' motion for summary judgment as to Mr. Case's wrongful foreclosure claim and further ordered that the foreclosure sale be set aside. *Id.*

We granted Wilmington's application for permission to appeal to address (1) whether Tennessee recognizes an independent common law cause of action for wrongful foreclosure, and (2) whether the Fannie Mae/Freddie Mac Uniform Tennessee Deed of Trust requires written notice of postponement in addition to an oral announcement, according to section 35-5-101(f) of the Tennessee Code. We also instructed the parties to address whether Mr. Case satisfies the requirements for constitutional standing.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 250 (Tenn. 2015) (quoting Tenn. R. Civ. P. 56.04). A trial court's ruling on a motion for summary judgment is reviewed de novo, without a presumption of correctness. *Id.* (citations omitted). Our standard of review for "questions of law is de novo without a presumption of correctness afforded to the lower court's conclusions of law." *Blair v. Brownson*, 197 S.W.3d 681, 683 (Tenn. 2006) (citations omitted).

## III. ANALYSIS

### A. Standing

We turn first to the question of standing. Standing is one of the justiciability doctrines that guide courts in determining whether to hear and decide a particular case.[5]

---

[4] We note that the Court of Appeals did not utilize the "last antecedent" canon of construction in its analysis. *See In re Estate of Tanner*, 295 S.W.3d 610, 624 (Tenn. 2009); Antonin Scalia & Bryant A. Garner, *Reading Law: The Interpretation of Legal Texts* 144–46 (2012).

[5] In addition to standing, the other justiciability doctrines that this Court has recognized are: the prohibition against advisory opinions, ripeness, mootness, the political question doctrine, and exhaustion of administrative remedies. *Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009).

*See Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 202–03 (Tenn. 2009). The standing inquiry determines whether a particular litigant is entitled to have the court decide the merits of his or her dispute. *City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013); *Am. C.L. Union of Tenn. v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006); *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976). "Grounded upon concern about the proper—and properly limited—role of the courts in a democratic society, the doctrine of standing precludes courts from adjudicating an action at the instance of one whose rights have not been invaded or infringed." *Darnell*, 195 S.W.3d at 619 (internal citations and quotation marks omitted). Without standing and other closely related justiciability doctrines, "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). A party's standing may turn on the nature of the claim, but the likelihood of success on the merits does not factor into the standing inquiry. *Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020).

In *City of Memphis v. Hargett*, this Court distinguished between two categories of standing: (1) constitutional standing and (2) non-constitutional standing.[6] 414 S.W.3d at 98. Non-constitutional standing is grounded either in self-imposed rules of judicial restraint, such as whether a party asserts its own legal rights and interests rather than those of third parties, or in statutory interpretation, such as whether a party's complaint falls within the zone of interests protected by the statutory provisions at issue. *See, e.g.*, *State v. Harrison*, 270 S.W.3d 21, 28 (Tenn. 2008); *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004). Constitutional standing, on the other hand, is grounded in the constitution itself. However, when the *City of Memphis* Court made this distinction, it appeared to base it upon federal jurisprudence interpreting constitutional provisions specific to the United States Constitution. *See* 414 S.W.3d at 98 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The *City of Memphis* Court did not explain to what extent the Tennessee Constitution mandates a standing doctrine, other than a passing reference to article II, sections 1 and 2 of the Tennessee Constitution. *See id.* Consequently, federal constitutional standing doctrine was adopted wholesale without an analysis of the differences between the two constitutions.

---

[6] Non-constitutional standing has also been referred to as "prudential standing" by courts throughout the country (including our own); however, the term "prudential standing" is a misnomer when applied to some aspects of non-constitutional standing, in particular the zone-of-interests test. *Compare Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (labeling "prudential standing" a misnomer when applied to the zone-of-interests test) *with Ditto v. Del. Sav. Bank*, No. E2006-01439-COA-RC-CV, 2007 WL 471146, at *3 (Tenn. Ct. App. Feb. 14, 2007) (listing the zone-of-interests test as one aspect of prudential standing).

This has engendered a lack of clarity among Tennessee courts as to the proper application of constitutional standing. *See, e.g.*, *Calfee v. Tenn. Dep't of Transp.*, No. M2016-01902-COA-R3-CV, 2017 WL 2954687, at *4–8 (Tenn. Ct. App. Jul. 11, 2017). Indeed, in briefing the issue of constitutional standing in this case, both parties assumed that the three-element constitutional standing test articulated in *Darnell* and *City of Memphis* applied to the facts of this case.[7] *See Darnell*, 195 S.W.3d at 620; *City of Memphis*, 414 S.W.3d at 98. Wilmington argues that Mr. Case does not have constitutional standing to assert his claims because (1) this Court adopted the federal injury-in-fact requirement in *Darnell*, and Mr. Case did not suffer a concrete injury in fact, and (2) his injury is not redressable under *Darnell*. *See* 195 S.W.3d at 620, 622. On the other hand, Mr. Case argues he has standing because he satisfies all three elements of the *Darnell* test. *See id.* at 620.

Today, we explore whether and to what extent the Tennessee Constitution mandates a standing doctrine in private rights cases. Because our constitutional standing doctrine was derived from its federal counterpart, we first examine the United States Constitution and standing doctrine developed by the Supreme Court of the United States, then proceed to the Tennessee Constitution and standing doctrine developed in this state.

*United States Constitution*

The federal doctrine of constitutional standing is rooted in Article III of the United States Constitution. *Lujan*, 504 U.S. at 560. Article III limits the federal judicial power to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). In federal courts, constitutional standing is a doctrine based in the traditional understanding of what constitutes a case or controversy, and limits claimants to those who can assert an actual case or controversy. *Id.* at 338. Thus, constitutional standing ensures that federal courts do not exceed their authority. *Id.* "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)); *see also Spokeo*, 578 U.S. at 337.

In *Lujan*, the United States Supreme Court found that while federal standing doctrine is partly comprised of prudential elements, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." 504 U.S. at 560. The Court held that the "irreducible constitutional minimum" of Article III's case-or-controversy requirement contains three elements:

---

[7] These three elements are (1) injury in fact, (2) causation, and (3) redressability, as discussed in greater detail *infra*. *See Darnell*, 195 S.W.3d at 620.

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[8]

*Id.* at 560–61 (internal quotation marks and citations omitted) (alterations in original). The *Lujan* plaintiffs sought a declaratory judgment and injunction that would require federal agencies to consult with the Secretary of the Interior to ensure that their actions overseas would not deleteriously affect endangered species. *Id.* at 557–59. However, the Court ruled that judicial review of a legislative or executive act, without an accompanying injury in fact, violates separation of powers: "To do so would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." *Id.* at 574 (quoting *Mass. v. Mellon*, 262 U.S. 447, 488–89 (1923)). The Court concluded that while "it is clear that in suits against the Government, at least, the concrete injury requirement must remain," it left open the possibility that when the legislature creates legal rights by statute, the invasion of these statutory rights by other parties could trigger standing even without a concrete injury. *Id.* at 578.

The Court's recent decisions in *Spokeo v. Robins, Inc.*, *Thole v. U.S. Bank N.A.*, and *TransUnion LLC v. Ramirez*, however, closed that possibility. *Spokeo,* 578 U.S. at 330; *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020); *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). In *Spokeo*, the plaintiff sued a consumer reporting agency for violations of the Fair Credit Reporting Act of 1970 ("FCRA"). 578 U.S. at 333. The Court found that under the three-element *Lujan* test, the plaintiff did not have Article III standing. *Id.* at 342. Even if the plaintiff could show a facial violation of the FCRA, he could not show an injury in fact: "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 341. Instead, "Article III standing requires a concrete injury even in the context of a

---

[8] The party invoking federal jurisdiction has the burden of proving these three elements "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. The Court noted that when the plaintiff challenges "the legality of government action or inaction" and "is himself an object of the action (or foregone action) at issue," there is usually little question that the three elements are met. *Id.* at 561–62. However, when the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Id.* at 562 (emphasis in original).

statutory violation." *Id.* The Court found that the alleged violations of the FCRA were not severe enough to constitute a concrete harm[9] and dismissed the case for lack of standing. *Id.* at 342–43.

In *Thole,* the Court continued down the path it trod in *Spokeo* and held that the plaintiffs did not have Article III standing to sue the managers of their defined-benefit retirement plan for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"). 590 U.S. at 540–41. Because the plaintiffs continued to receive the same benefits regardless of the defendants' actions, they did not suffer a concrete harm under *Lujan's* injury-in-fact requirement. *Id.* at 547.

In *TransUnion*, plaintiffs sued a credit reporting agency for violations of FCRA for failing to use reasonable measures to protect the accuracy of their credit files, which caused plaintiffs to be erroneously identified as potential terrorists, drug traffickers, or serious criminals. 594 U.S. at 417–20. Some plaintiffs' erroneous reports were disseminated to third parties. *Id.* at 417. Importantly, Congress had provided in the FCRA that "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer," for actual or statutory damages, as well as punitive damages. *Id.* at 419 (quoting 15 U.S.C. § 1681n(a)). However, despite a statute expressly authorizing suit, the Court found that plaintiffs whose reports were not disseminated to third parties had no standing under Article III because they suffered no concrete harm under *Lujan's* injury-in-fact requirement: "No concrete harm, no standing." *Id.* at 442. The Court reasoned that without concrete harm, "Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law." *Id.* at 428. Such a policy would invade the executive branch's power to ensure that laws are duly observed. *Id.* at 429 (citing *Lujan*, 504 U.S. at 577). Thus, "under Article III, an injury in law is not an injury in fact." *Id.* at 427.

*TransUnion's* majority opinion generated a sharp dissent by Justice Thomas. While Justice Thomas had previously concurred in both the *Spokeo* and *Thole* decisions, in his view the *TransUnion* majority had gone too far: "In the name of protecting the separation of powers, this Court has relieved the legislature of its power to create and define rights." *Id.* at 454 (Thomas, J., dissenting) (internal citation omitted). Whereas *Spokeo* and *Thole* concerned public rights, Thomas argued, *TransUnion* concerned private rights and merited a different analysis. *Id.* at 446–49. Since our country's founding, a plaintiff asserting his or her own private right at common law only had to show an injury in law; courts did not require an additional showing of injury in fact, or damages. *Id.* On the other hand, when one asserted a public right—a violation of a duty belonging to the community—courts

---

[9] The Court noted that some intangible harms may be sufficiently concrete to constitute an injury in fact and instructed courts to consider whether the intangible harm bears a "close relationship" to a harm traditionally recognized as providing a basis for suit in American courts. *Id.* at 341.

required a showing of not only injury in law (*injuria*), but also damages (*damnum*). *Id.* at 447; *see also Spokeo*, 578 U.S. at 344–45 (Thomas, J., concurring). This distinction between private and public rights applied not only to common law rights, but also to statutory rights. *TransUnion*, 594 U.S. at 447. Moreover, when the injury-in-fact requirement was introduced in 1970, its purpose was to expand the class of persons who had standing, not restrict it. *Id.* at 450–51 (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Because the right asserted in *TransUnion* was a private right, Justice Thomas wrote, the plaintiffs whose reports were not disseminated to third parties had standing to assert their claim. "Never before has this Court declared that legal injury is *inherently* insufficient to support standing." *Id.* at 453–54 (emphasis in original).

Justice Thomas' concurring opinions in *Spokeo* and *Thole* likewise expounded on the importance of the distinction between private and public rights. In *Spokeo*, he pointed out that separation of powers concerns relative to standing are "generally absent when a private plaintiff seeks to enforce only his personal rights against another private party." 578 U.S. at 344 (Thomas, J., concurring); *see also id.* at 347 ("The separation-of-powers concerns underlying our public-rights decisions are not implicated when private individuals sue to redress violations of their own private rights."). He argued the rule ought to be that "[a] plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that private right." *Id.* at 348. On the other hand, "[a] plaintiff seeking to vindicate a public right embodied in a federal statute . . . must demonstrate that the violation of that public right has caused him a concrete, individual harm distinct from the general population." *Id.*

Justice Thomas' concerns notwithstanding, every single case in federal court must meet the "irreducible constitutional minimums" of *Lujan*. Plaintiffs must not only show a violation of the law, but also an injury in fact with concrete harm, regardless of whether they are seeking to redress a private or public right.[10]

---

[10] Just as in *Lujan*, *see supra* note 7, both *Spokeo* and *TransUnion* emphasized that "[c]entral to assessing concreteness" is whether the alleged harm bears a "close relationship" to a harm traditionally recognized under common law. *TransUnion*, 594 U.S. at 417; *Spokeo*, 578 U.S. at 340-41. Since *TransUnion*, federal appellate courts have been divided as to whether an injury to a common-law right constitutes a concrete harm under Article III. *Compare Glennborough Homeowners Assoc. v. U.S. Postal Serv.*, 21 F.4th 410, 415 (6th Cir. 2021) (finding breach of contract is sufficient injury to confer standing) and *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) (same) *with Dinerstein v. Google, LLC*, 73 F.4th 502, 519 (7th Cir. 2023) (finding breach of contract alone, without injury in fact, is insufficient to confer standing).

*Tennessee Constitution*

In contrast to the United States Constitution, the Tennessee Constitution contains no language limiting the judicial power to "cases" or "controversies." Tenn. Const. art. II, §§1–2; *Norma Faye Pyles Lynch*, 301 S.W.3d at 202. In the absence of such language, we have found that our state constitution is not coincident with the United States Constitution in its constraint on judicial power. *See Miller v. Miller*, 261 S.W. 965, 971 (Tenn. 1924); *see also Norma Faye Pyles Lynch*, 301 S.W.3d at 202 ("[W]hile Article III, Section 2 of the United States Constitution confines the jurisdiction of the federal courts to 'cases' and 'controversies,' the Constitution of Tennessee contains no such direct, express limitation on Tennessee's courts' exercise of their judicial power."). Thus, the United States Supreme Court's interpretations as to the limits of federal jurisdiction under Article III are not directly applicable to Tennessee courts' jurisdiction under the Tennessee Constitution.

Most states likewise have found that their state constitutions place separate parameters on standing doctrine than does the United States Constitution. Wyatt Sassman, *A Survey of Constitutional Standing in State Courts*, 8 Ky. J. Equine, Agric. & Nat. Res. L. 349, 398 (2016); *see, e.g.*, *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 853 S.E.2d 698 (N.C. 2021); *Sons of Confederate Veterans v. Henry Cnty. Bd. of Comm'rs*, 880 S.E.2d 168 (Ga. 2022); *Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686 (Mich. 2010); *Heffernan v. Missoula City Council*, 255 P.3d 80, 90–92 (Mont. 2011); *Foley-Ciccantelli v. Bishop's Grove Condo Ass'n, Inc.*, 797 N.W.2d 789, 798–99 (Wis. 2011). While constitutional standing doctrine takes myriad forms in various state courts, state courts consistently find that Article III of the United States Constitution does not control state standing doctrine. Moreover, as courts of general jurisdiction, state courts' role is inherently different from the role of federal courts of limited jurisdiction. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986); *Turner v. Bank of N. Am.*, 4 U.S. 8, 8 (1799).

Therefore, we ask, what limitations *does* the Tennessee Constitution place on standing? Two provisions in our state constitution guide our inquiry: (1) the open courts provision under article I, section 17, which acts to ensure that the jurisdiction of our courts is sufficiently expansive to protect the legal rights of our citizens, and (2) the separation of powers provision under article II, sections 1 and 2, which acts to constrain the jurisdiction of our courts so as not to intrude on the authority of our other branches of government. We look to each of these in turn.

*Open Courts Provision*

Article I, section 17 of the Tennessee Constitution states:

That all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law,

and right and justice administered without sale, denial, or delay. Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct.

Tenn. Const. art. I, § 17. While little discussed in recent years, our open courts provision has its origins in the Magna Carta and embodies several of the Magna Carta's most important principles. William C. Koch, Jr., *Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution*, 27 U. Mem. L. Rev. 333, 449 (1997). This Court has found that the open courts provision provides a citizen "the right to have all questions touching his life, liberty or property heard, passed upon, and determined by the regular and constitutional courts of the State," and that "such right is inalienable." *Louisville & Nashville R.R. Co. v. Bate*, 80 Tenn. 573, 577 (1883); *see also State v. Bank of Tenn.*, 62 Tenn. 395, 403 (1874). In consequence, we have deeply ingrained in our jurisprudence the principle that there can be "no wrong without a remedy," and that remedy must provide for judicial review "in some form or fashion." Koch, *supra*, at 418–19 (citing *State v. Johnson*, 569 S.W.2d 808, 814 (Tenn. 1978)); *see also Johnson v. White*, 106 S.W.2d 222, 223 (Tenn. 1937) ("[F]or every right there is a remedy.").

Thirty-eight states have similar constitutional provisions.[11] *Id.* at 341. *See, e.g.*, Pa. Const. art. I, § 11 (upon which Tennessee likely modeled its open courts provision); N.C. Const. art. I, § 18; S.C. Const. art. I, § 9; Ky. Const. § 14; Md. Const. art. 19; Del. Const. art. I, § 9; Mass. Const. art. XI; Ala. Const. art. I, § 13. These constitutional provisions derive from the principle, embedded in law at the time of the first constitutional conventions, that an injury to a private right warranted redress by the courts even in the absence of an injury in fact. *See* F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275, 284–85 (2008). For instance, courts allowed plaintiffs to maintain actions for trespass on their property even when they suffered no injury in fact due to the trespass. *Id.* at 281; *see also Spokeo*, 578 U.S. at 344–45 (Thomas, J., concurring). The violation of a legal right alone was sufficient to access the courts.

In addition, our prior decisions interpreting the open courts provision denote that the phrase "an injury done him" means an injury in law, regardless of the presence or absence of damages. In *Barnes v. Kyle*, this Court found that "[t]he phrase 'an injury done him' necessarily means a legal injury, that is, a violation of his legal rights in some way, or a violation of law that affect him adversely." 306 S.W.2d 1, 3 (Tenn. 1957). The *Barnes* Court stated that the word injury "comes from the Latin words 'in,' meaning against, and 'jus,' meaning a right and signifies something done 'against the right' of another person,

---

[11] New Mexico's inclusion would tally thirty-nine. While New Mexico does not have an open courts or right to remedy provision in its constitution, it has found an implicit right of access to its courts in its constitution. *See Richardson v. Carnegie Libr. Rest., Inc.*, 763 P.2d 1153, 1161 (N.M. 1988), abrogated on other grounds by *Trujillo v. City of Albuquerque*, 965 P.2d 305 (N.M. 1998).

producing *either nominal or substantial* damages." *Id.* at 4 (emphasis added). However, the Court made it clear that the open courts provision guaranteed access to the courts and remedy only for injuries to legal rights cognizable under constitutional, statutory, or common law. *Id.* "It is an ancient maxim, that a damage to one, without an injury [in law] . . . does not lay the foundation of an action." *Id.* (quoting *Ala. Power Co. v. Ickes*, 302 U.S. 464, 479 (1938)). Because the petitioner in *Barnes* did not allege violation of a cognizable legal right, she had "no right to intervene." *Id.* at 5.

Moreover, this Court has previously held that nominal damages may be awarded when there are no damages or "injury in fact." *See, e.g.*, *Whittington v. Grand Valley Lakes, Inc.*, 547 S.W.2d 241, 243 (Tenn. 1977) (nominal damages for trespass on property); *Bradford & Carson v. Montgomery Furniture Co.*, 92 S.W. 1104, 1110 (Tenn. 1906) (stating that where plaintiff in breach of contract claim "has sustained no damages which are the natural and proximate results of the breach, he has sustained no injury, and can only recover nominal damages"); *Jones v. W.U. Tel. Co.*, 47 S.W. 699, 700 (Tenn. 1898) (nominal damages for breach of contract); *Lay v. Bayless*, 44 Tenn. (4 Cold.) 246, 247 (1867) (nominal damages for conversion of horse that was later returned); *Seat v. Moreland*, 26 Tenn. (7 Hum.) 575, 576 (1847) (nominal damages for breach of contract).

Thus, the open courts provision in and of itself does not require those pursuing a claim for injury to their lands, goods, person or reputation to have an injury in fact. *See Barnes*, 306 S.W.2d at 4. However, they still must have an "injury"—that is, at a minimum they must have an *injury in law* to access the courts. *Id.* As a result, the open courts provision requires that a person asserting an injury to their land, goods, person, or reputation—i.e., private rights claims—allege an injury in law in order to have standing in court.[12]

In contrast to the Tennessee Constitution, the United States Constitution contains no open courts provision or right to remedy provision. Thus, while the United States Supreme Court can interpret its own constitutional standing doctrine in the absence of such a provision, we cannot. Tennessee's constitutional standing doctrine must take into

---

[12] The separate opinion misconstrues our interpretation of the open courts provision. Our holding is based on the text "an injury done him." Tenn. Const. art. I, § 17. In private rights cases, "an injury done him" means a legal injury. Our courts are open, but they are not open to those without an injury in law. This principle has its origins in English common law and has been embedded in Tennessee jurisprudence. *See Barnes*, 306 S.W.2d at 3–4 (relating the provision's injury requirement to the maxims damnum absque injuria (damage without [legal] injury) and ex damno sine injuria non oritur actio (an action does not rise from damage without [legal] injury)); *see also* 3 William Blackstone, Commentaries *125 (noting that in situations of damnum absque injuria, "where there is no [legal] injury, the law gives no remedy").

The separate opinion maintains that we are relying on the open courts provision to restrict a plaintiff's ability to sue. In fact, however, our interpretation of the open courts provision expands a plaintiff's ability to sue in private rights cases by clarifying that such a plaintiff need not allege a concrete injury in fact in addition to a legal injury.

account the fact that our constitution guarantees access to the courts and remedy for every injury to one's "lands, goods, person or reputation." Tenn. Const. art. I, § 17.

*Separation of Powers Provision*

The separation of powers provision functions as a check-rein to our courts' jurisdiction. Our constitution delineates separation of powers under article II, section 1: "The powers of the Government shall be divided into three distinct departments: Legislative, Executive, and Judicial." Tenn. Const. art. II, § 1. Section 2 continues: "No person or persons belonging to one of these departments shall exercise any of the powers belonging to either of the others, except in the cases herein directed or permitted." Tenn. Const. art. II, § 2. Thus, the separation of powers provision expressly prohibits the judicial branch from exercising any powers belonging to the executive or legislative branches.

While article VI, section 1 provides that "[t]he judicial power of this State shall be vested in one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish," our constitution does not further define "judicial power." Tenn. Const. art. VI, § 1. Nevertheless, this Court has understood the "peculiar province of the judicial department" to be the power "[t]o adjudicate upon, and protect, the rights and interests of individual citizens, and to that end to construe and apply the terms." *Mabry v. Baxter*, 58 Tenn. (11 Heisk.) 682, 690 (1872); *see also Mengel Box Co. v. Fowlkes*, 186 S.W. 91, 92 (Tenn. 1916). "[T]he province of a court is to decide, not advise, and to settle rights, not to give abstract opinions . . . ." *State v. Wilson*, 70 Tenn. 204, 210 (1879). To that end, we have said that we only decide "legal controversies."[13] *White v. Kelton*, 232 S.W. 668, 670 (Tenn. 1921); *see also Norma Faye Pyles Lynch*, 301 S.W.3d at 203 (defining "legal controversy" under Tennessee law). Inasmuch as the judicial branch derives its authority from the judicial power clause, it "must, in turn, subordinate itself to the Constitution's requirements." *Mayhew v. Wilder*, 46 S.W.3d 760, 783 (Tenn. Ct. App. 2001) (Koch, J., concurring). In consequence, Tennessee courts have refrained from deciding cases when doing so would violate separation of powers.

Tennessee courts have long recognized the role that standing plays in upholding separation of powers. In *Patten v. City of Chattanooga*, resident citizens and taxpayers filed suit to declare void a municipal ordinance granting a telephone company the right to build a telephone system in city streets. 65 S.W. 414, 419 (Tenn. 1901). This Court found that as the plaintiffs' suit sought to redress a public right, the suit failed absent a showing of special injury "not common to the body of the citizens." *Id.* at 420. The Court explained

---

[13] In *Miller v. Miller*, this Court explained that although the United States Supreme Court found declaratory judgments impermissible under the Case or Controversy Clause of the United States Constitution, the only "controversy" needed under Tennessee's Declaratory Judgment Act is that "the question must be real, and not theoretical; the person raising it must have a real interest, and there must be some one having a real interest in the question who may oppose the declaration sought." 261 S.W. at 972.

that entertaining such a suit overstepped the power delegated to other branches of government:

> In all such matters—matters which affect not the private rights of certain citizens, but only those public rights which are common to all, and incident to citizenship itself—the law confers upon the duly-elected representatives of the people the sole right to appeal to the courts for redress. It is only when he can go further, and show some right which he has aside from those rights which are incident to the mere fact of citizenship, that he may, for himself or in behalf of others similarly situated, invoke the conceded jurisdiction of the courts to restrain an ordinance passed irregularly or without authority. Matters of common interest, both of original action and of redress, are intrusted to duly-chosen public officials, and in such matters the chancery court is not open to confer upon private citizens the right of public guardianship. In short, such a bill as complainants present can be maintained only to protect private, and not public, rights.

*Id.* We emphasized that this rule requiring a special injury not common to the body of citizens was "well-settled" and "without exception." *Id.* at 421. Because the suit sought to redress a public right entrusted to elected representatives, the plaintiffs had no "status in court." *Id.* at 421–22.

Subsequent cases likewise found separation of powers imperiled when plaintiffs sought to challenge government action without a special injury, and dismissed such suits for lack of standing. *See, e.g.*, *Skelton v. Barnett*, 227 S.W.2d 774, 775 (Tenn. 1950) (finding suit was "not maintainable at the instance of a private citizen, but must be brought on relation of the State"); *Badgett v. Broom*, 409 S.W.2d 354 (Tenn. 1966). In *Bennett v. Stutts*, we again held that resident and taxpayer[14] plaintiffs did not have standing to bring suit redressing a "patent public wrong." 521 S.W.2d 575, 576 (Tenn. 1975). We explained the separation of powers concerns underlying this standing rule: "When the duty of taking appropriate action for the enforcement of a statute is entrusted solely to a named public officer, private citizens cannot intrude upon his function" absent a showing of special interest or special injury not common to the public, or absent a statute imposing liability.

---

[14] Under this Court's earlier jurisprudence, taxpayers, too, were required to allege an injury not common to the public when suing the government. They could satisfy this burden by alleging that the government's misconduct increased their tax burden. *See State v. Brown*, 21 S.W.2d 721, 723 (Tenn. 1929); *Patten*, 65 S.W. at 421; *Ford v. Farmer*, 28 Tenn. (9 Hum.) 152, 158–60 (1848). In recent years, this Court has held that taxpayers suing the government are not required to allege a distinct injury as long as they "(1) allege[] a 'specific illegality in the expenditure of public funds' and (2) ha[ve] made a prior demand on the governmental entity asking it to correct the alleged illegality." *Fannon v. City of LaFollette*, 329 S.W.3d 418, 427 (Tenn. 2010) (quoting *Cobb v. Shelby Cnty. Bd. of Comm'rs*, 771 S.W.2d 124, 126 (Tenn. 1989)). This is not a taxpayer standing case. Therefore, our analysis does not address taxpayer standing issues.

*Id.* at 577.  Moreover, "[i]n cases of purely public concern and in actions for wrongs against the public . . . the remedy, whether civil or criminal, is as a general rule by a prosecution instituted by the state in its political character, or by some officer authorized by law to act in its behalf . . . ."[15]  *Id.*

More recently, in *American Civil Liberties Union of Tennessee v. Darnell* and *City of Memphis v. Hargett*, this Court employed a three-element test to determine standing when plaintiffs challenged the action of another branch of government.  *Darnell*, 195 S.W.3d at 620; *City of Memphis*, 414 S.W.3d at 98.  This test was derived from federal jurisprudence and is essentially the *Lujan* test, albeit with slightly different wording.  The three elements of this test are:

> First, a party must show an injury that is distinct and palpable; injuries that are conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry are insufficient in this regard. Second, a party must demonstrate a causal connection between the alleged injury and the challenged conduct.  While the causation element is not onerous, it does require a showing that the injury to the plaintiff is fairly traceable to the conduct of the adverse party.  The third and final element is that the injury must be capable of being redressed by a favorable decision of the court.

*City of Memphis*, 414 S.W.3d at 98 (internal quotation marks and citations omitted); *see also Darnell*, 195 S.W.3d at 620 (characterizing the first element of the test as "injury in fact").

Notably, in all of our prior cases in which we utilized this test, the plaintiffs sought judicial review of actions of other branches of government by challenging either statutes, constitutional amendments, or other legislative or executive acts.  In each one of these cases, the defendant was a government entity or government official.  *See City of Chattanooga v. Davis*, 54 S.W.3d 248, 280 (Tenn. 2001) (challenging municipality's policies and practices for allegedly usurping authority of District Attorney General); *Darnell*, 195 S.W.3d at 620 (seeking to enjoin Secretary of State from placing constitutional amendment on election ballot); *Lynch v. City of Jellico*, 205 S.W.3d 384, 394–95 (Tenn. 2006) (challenging facial constitutionality of workers' compensation statutes); *Jordan v. Knox Cnty.*, 213 S.W.3d 751, 764 (Tenn. 2007) (challenging validity of county charter); *Fannon v. City of LaFollette*, 329 S.W.3d 418,  424 (Tenn. 2010) (alleging city council members violated Open Meetings Act under Tenn. Code Ann. § 8-

---

[15] The *Bennett* concurrence noted that in such situations, citizens may bring a quo warranto suit in the name of the district attorney general as long as the district attorney general agrees that suit is proper. *Id.* at 577–78 (citing *State ex rel. Wallen v. Miller*, 304 S.W.2d 654 (Tenn. 1956)).

44-106); *City of Memphis*, 414 S.W.3d at 98 (challenging constitutionality of Tennessee Voter Identification Act); *Fisher*, 604 S.W.3d at 396 (challenging absentee voting requirements enacted by state officials during COVID-19 pandemic); *Metro. Gov't of Nashville and Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d 141, 149 (Tenn. 2022) (municipality and counties challenging constitutionality of Tennessee Education Savings Account Pilot Program under Home Rule Amendment). Thus, all of our cases utilizing the three-element standing test involved public rights and addressed separation of powers concerns. The test ensures the judicial branch operates within the judicial power by adjudicating the rights and interests of affected citizens and not entangling itself in political disputes within the province of the other branches of government. *Cf. Mabry*, 58 Tenn. at 590; *Mengel Box*, 186 S.W. at 92.

In summary, (1) the open courts provision requires litigants to allege injury to a recognized legal right, and (2) the separation of powers provision requires litigants in public rights cases to allege an injury in fact not common to the public. *See* Tenn. Const. art. I, § 17; *id.* art. II, §§ 1–2; *Barnes*, 306 S.W.2d at 4; *Darnell*, 195 S.W.3d at 620. A simpler way to say this is that all claims must allege an "injury." In private rights claims, injury in law is sufficient. In public rights claims,[16] there must also be an injury in fact, in addition to the causation and redressability elements required by *Darnell* and *City of Memphis*. *Darnell*, 195 S.W.3d at 620; *City of Memphis*, 414 S.W.3d at 98.

Consequently, the three-element *City of Memphis* test is inapplicable to cases alleging the violation of a private right. Applying the test to such cases serves no purpose in upholding separation of powers, as integrity of separation of powers is not at stake in such cases. Nevertheless, a plaintiff alleging a violation of a private right must assert injury to a cognizable legal right in order to have standing.[17] Tenn. Const. art. I, § 17; *Barnes*, 306 S.W.2d at 4.

---

[16] Because the case before us clearly concerns only private rights, we do not attempt to further define public rights or articulate a test distinguishing between public and private rights here beyond what our jurisprudence has already articulated. *See, e.g.*, *Patten*, 65 S.W. at 420. Further distinction between public and private rights under Tennessee law is better left to a case in which the need for such distinction is presented.

[17] Some private rights claims also require injury in fact as an element—e.g., serious mental injury is an element of the tort of intentional infliction of emotional distress. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210–11 (Tenn. 2012). However, a plaintiff's inability to prove injury in fact in such claims is not a constitutional standing issue. It merely shows that the plaintiff has failed to prove an essential element of the claim.

We turn to the instant case. Both Mr. Case and Wilmington are private parties. Mr. Case held a property interest in the real property at issue, which is a private right. He alleges that Wilmington violated his rights with respect to that property by failing to give him proper notice of the foreclosure sale as required by their contract, and by subsequently foreclosing on the property. This suit alleges the violation of a private right, nothing more. Because this case only concerns a private right, the *City of Memphis* test is inapplicable. However, Mr. Case must allege injury to a cognizable legal right. We find that he does so; he alleges injuries to his contract rights and property rights—injuries that our law recognizes as grounds for remedy. *See* Tenn. Const. art. I, § 17 ("[E]very man, *for an injury done him in his lands*, goods, person or reputation, shall have remedy by due course of law . . . .") (emphasis added); *Benz-Elliott v. Barrett Enters., LP*, 456 S.W.3d 140, 152 (Tenn. 2015). Therefore, Mr. Case has constitutional standing to bring his claim.

We emphasize that "the likelihood of success on the merits does not factor into" the standing inquiry. *See Fisher*, 604 S.W.3d at 396. We evaluate standing simply to determine whether a party has a right to bring a claim. Whether a party is ultimately successful in litigating that claim is the next step in our analysis. *See City of Memphis*, 414 S.W.3d at 97. We now turn to the merits of Mr. Case's claim.

## B. Wrongful Foreclosure

The next question for this Court to answer is whether the remaining claim for "wrongful foreclosure" is actionable under Tennessee law. Based upon the following review and analysis, we hold that it is not. We decline to recognize a common law cause of action for wrongful foreclosure in Tennessee.

For a cause of action to exist, its recognition generally must be supported in the history of this state's decisions. *See Brumit v. Summar*, No. 01A01-9703-CV-00109, 1997 WL 764496, at *2 (Tenn. Ct. App. Dec. 12, 1997); *cf. West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 646 (Tenn. 2001) (recognizing a cause of action under Tennessee law for false light invasion of privacy based on an analysis of Tennessee case law, the case law of other states, and the need to protect certain recognized private rights left unprotected by then-existing causes of action). However, a review of our case law demonstrates that the terminology used by the Court of Appeals of a "wrongful foreclosure" claim is a relatively modern development with little explicit recognition that such a claim exists. There were only five opinions using this terminology issued by Tennessee courts before 2006. *See Held v. Tenn. Title Co.*, 448 S.W.2d 413, 414 (Tenn. 1969) (upholding demurrer of plaintiff's "bill for wrongful foreclosure"); *Overholt v. Merchs. & Planters Bank*, 637 S.W.2d 463, 463 (Tenn. Ct. App. 1982) (holding that defendant was required to accept a late mortgage payment when it was tendered prior to proper acceleration under a deed of trust); *Whitsey v. Williamson Cnty. Bank*, 700 S.W.2d 562, 562 (Tenn. Ct. App. 1985) (affirming res judicata barred a plaintiff's claim for "wrongful foreclosure of a trust deed"

as defendant had obtained summary judgment in federal court on a claim alleging the same notice defect); *Fed. Land Bank of Louisville v. Cloar*, Henry Equity No. 3, 1989 WL 155933, at *2 (Tenn. Ct. App. Dec. 28, 1989) (holding that foreclosure was improper as the mortgagee was not in default of the deed of trust based on the court's interpretations of the deed of trust under contractual rules of construction); *Lebs P'ship, Ltd. v. Nw. Mut. Life Ins. Co.*, No. 965, 1992 WL 25001, at *4 (Tenn. Ct. App. Feb. 14, 1992) (holding that the denial of relief to enjoin a foreclosure sale was proper as there had been "no showing of a wrongful foreclosure" as none of the grounds necessary for such a request were met). None of these decisions specifically recognized that "wrongful foreclosure" was a stand-alone claim. Likewise, this Court has never directly recognized this cause of action.

The purported explicit recognition of a direct action for "wrongful foreclosure" by an appellate court in Tennessee did not occur until 2015. *See Garner v. Coffee Cnty. Bank*, No. M2014-01956-COA-R3-CV, 2015 WL 6445601, at *10 (Tenn. Ct. App. Oct. 23, 2015), *no appl. for perm. to appeal filed*. In *Garner*, the Tennessee Court of Appeals relied on *Overholt v. Merchants & Planters Bank* for the proposition that "wrongful foreclosure" can be asserted "as a primary cause of action when a mortgagor asserts that a foreclosure action is improper under a deed of trust." *Id.* (citing *Overholt*, 637 S.W.2d at 463–67). The federal District Court for the Middle District of Tennessee has also relied upon the *Garner* analysis of the *Overholt* opinion for the proposition that Tennessee law recognizes a distinct cause of action for wrongful foreclosure. *See Beasley v. Wells Fargo Bank, N.A.*, No. 3:17-CV-00726, 2017 WL 3387046, at *5 (M.D. Tenn. Aug. 7, 2017), *aff'd sub nom. Beasley v. Wells Fargo Bank, N.A. for Certificate Holders of Park Place Sec., Inc.*, 744 Fed. Appx. 906 (6th Cir. 2018) (citing *Garner*, 2015 WL 6445601, at *10); *Amodio v. Ocwen Loan Servicing, LLC*, No. 3:18-CV-00811, 2018 WL 6727106, at *3 (M.D. Tenn. Dec. 21, 2018) (citing *Garner*, 2015 WL 6445601, at *10).

However, we disagree with the Court of Appeals in *Garner*—and subsequent citations thereto—as to its analysis of the opinion in *Overholt*. The *Overholt* decision involved a bank refusing to accept a late mortgage payment from the borrower. *Overholt*, 637 S.W.2d at 464. The borrower had appealed the trial court's denial of "relief from a wrongful foreclosure under a deed of trust." *Id*. at 463. The court found that the bank had been "lying in wait" for the borrower to commit a technical error so it could foreclose on the property. *Id*. at 465. The borrower's agent attempted to deliver a check by hand one day after the monthly due date, which the bank refused to accept. *Id*. The court's decision hinged on whether the bank had complied with the acceleration clause contained within a deed of trust in light of Tennessee law regarding the tender of payment after default on a mortgage. *See id*. at 464–67. The deed of trust at issue stated:

> The first payment due and succeeding payments due on the same day of each succeeding month until the entire principal and interest is fully paid. Said

payments are a series and default in any payment when due shall, at the option of the owner of said note, mature the remaining unpaid indebtedness.

*Id.* at 464 (quotation marks omitted). The court held that Tennessee law required a mortgage holder to accept payment when it is made after default but before the option to accelerate the note is exercised. *Id.* at 466 (citing *Lee v. Sec. Bank & Tr. Co.*, 139 S.W. 690, 692 (Tenn. 1911)). Based on this analysis, the court held that because the bank had not clearly exercised its option in compliance with the deed of trust to accelerate the note after default and before the borrower tendered payment, the bank had been bound to accept such payment. *Id.* at 467. Additionally, the borrower was excused from subsequent missed payments because it was reasonably certain that such tender would have been refused by the bank. *Id.* at 466. The court remanded to the trial court with instructions that the failure to issue injunctive relief had been in error. *Id.* at 467.

For over thirty-three years, the *Overholt* decision was cited solely for (1) its analysis of the obligations of parties when a post-default, pre-acceleration payment is tendered and (2) the necessity of tendering payment when refusal is certain. *See, e.g.*, *Stroop v. S. Life Ins. Co.*, 660 S.W.2d 46, 48 (Tenn. Ct. App. 1983) (citing *Overholt* for the proposition that late tender is sufficient if made before acceleration); *Owen v. Arcata Graphics/Kingsport Press*, 813 S.W.2d 442, 446 (Tenn. Ct. App. 1990) (citing for the proposition that "tender is unnecessary when it is reasonably certain that the tender will be refused") (citations and internal quotations omitted). The court never discussed the specific claims brought by the plaintiffs in the underlying action, save for acknowledgement that the chancery court had denied the plaintiffs "relief from a wrongful foreclosure under a deed of trust." *Overholt*, 637 S.W.2d at 463.

We disagree that *Overholt* stands for the proposition that wrongful foreclosure can be asserted as a distinct claim under Tennessee law. The basis for the opinion was centered around a failure by the bank to comply with the terms of the deed of trust, and the court's analysis clearly contemplated harm to the borrower by the bank's breach. *Overholt* did not hold that wrongful foreclosure is an independent cause of action under Tennessee law. Rather, it merely discussed the bank's failure to satisfy its obligations under the deed of trust. As such, neither the *Garner* court's analysis of *Overholt*, nor any subsequent decisions relying upon this analysis, support the proposition that wrongful foreclosure is an independent, common law claim in Tennessee. A cascade of erroneous interpretations cannot serve as the basis to recognize a cause of action. To the extent that lower courts in

this state have relied upon *Garner* to find that "wrongful foreclosure" can be asserted as an independent claim, such reliance was misplaced.[18]

The Court of Appeals here relied upon both *Garner* and additional case law that similarly fails to support the conclusion that wrongful foreclosure is an independent cause of action under Tennessee law. *Case*, 2022 WL 2313548, at *8 (citing *Garner*, 2015 WL 6445601, at *10). In discussing Mr. Case's claims alleging Defendant's failure to comply with the notice requirements in the Deed of Trust, the Court of Appeals cited three cases (two directly, one internally) in addition to *Garner* purporting to support the existence of an independent wrongful foreclosure cause of action based on improper notice. *Id.* at *8–9 (citing *CitiFinancial Mortg. Co., Inc. v. Beasley*, No. W2006-00386-COA-R3-CV, 2007 WL 77289, at *8–9 (Tenn. Ct. App. Jan. 11, 2007); *Henderson v. Galloway*, 27 Tenn. (8 Hum.) 692, 696 (1848); *Progressive Bldg. & Loan Ass'n v. McIntyre*, 89 S.W.2d 336, 336 (Tenn. 1936)). However, these cases do not involve direct actions for wrongful foreclosure; rather, they involve the invocation of wrongful foreclosure as an affirmative defense to both unlawful detainer (*Beasley*, 2007 WL 77289, at *5) and ejectment (*Henderson*, 27 Tenn. at 692), and as a defense to a breach of a contract to purchase real property (*McIntyre*, 89 S.W.2d at 336).

We decline to create or recognize a cause of action where no real precedent exists, particularly when established causes of action already apply to the factual scenario. The recognition of a tort is not something to be done lightly, and we will not assume a cause of action exists merely because lower courts have begun using a certain descriptive phrase. There can be breaches of contract, torts, and statutory causes of action based on allegations of "wrongful foreclosure," but the use of that terminology to describe a claim does not transform it into its own separate common law cause of action. For instance, "negligence" is a cause of action; "bad driving," despite maybe being an accurate summation of an automobile-related personal injury case, is not a cause of action. Similarly, "breach of contract" is a cause of action, while "wrongful foreclosure" is merely a description of the breach. If Tennessee law recognized a common law cause of action for wrongful foreclosure, there would be opinions specifying its elements, discussing its affirmative defenses, and analyzing its statute of limitations. Instead, the case law of this state reflects that "wrongful foreclosure" is merely a description of the underlying factual basis for the substantive cause of action actually being asserted.

To avoid any future confusion as to the applicability of its language, this Court hereby overrules *Garner*, as well as all other opinions relying upon it, to the extent this line of cases has found that Tennessee law recognizes a distinct cause of action for wrongful

---

[18] We also express our disagreement with the holdings and predictions of any federal courts that have relied upon *Garner* to find a common law cause of action for wrongful foreclosure in Tennessee. *See, e.g.*, *Amodio*, 2018 WL 6727106, at *3 (citing *Garner*, 2015 WL 6445601, at *10).

foreclosure. That said, borrowers who believe their property was unlawfully foreclosed are not left without recourse. Generally, courts analyzing claims for foreclosures gone wrong in Tennessee have done so under three theories: breaches of contract, tort claims, and statutory violations. *See Garner*, 2015 WL 6445601, at *2 (involving a breach of an agreement by mortgage holder to accept certain late payments and not seek foreclosure); *Overholt*, 637 S.W.2d at 463–64 (analyzing an alleged breach of a deed of trust); *Jerles v. Phillips*, No. M2005-1494-COA-R3-CV, 2006 WL 2450400, at *7–8 (Tenn. Ct. App. Aug. 22, 2006) (analyzing an alleged breach of a deed of trust); *Cowan v. Child*, No. 03A01-9209-CH-326, 1993 WL 141552, at *2 (Tenn. Ct. App. May 5, 1993) (analyzing an alleged breach of a deed of trust); *Ringold v. Bank of Am. Home Loans*, No. 2:12-CV-02344-JPM, 2013 WL 1450929, at *4–6 (W.D. Tenn. Apr. 9, 2013) (analyzing an alleged breach of a deed of trust); *Ogle v. U.S. Bank Nat'l Ass'n for Residential Asset Sec., Corp.*, No. 1:17-CV-40-TAV-CHS, 2018 WL 1324137, at *3 (E.D. Tenn. Mar. 14, 2018) (analyzing an alleged federal statutory violation); *Amodio*, 2018 WL 6727106, at *4 (analyzing an alleged statutory violation); *Beal Bank, SSB v. Prince*, No. M2011-02744-COA-R3-CV, 2013 WL 411452, at *1, *3 (Tenn. Ct. App. Jan. 31, 2013) (analyzing claims for conspiracy, negligence, and negligent infliction of emotional distress); *Faulkner v. Nationstar Mortg. LLC*, No. W2020-01148-COA-R3-CV, 2022 WL 17258688, at *2, *4 (Tenn. Ct. App. Nov. 29, 2022) (analyzing a claim for conversion of real property).

In this case, summary judgment was entered against Mr. Case as to his breach of contract claim for failure to establish a breach of the Deed of Trust or any related damages. This ruling was not raised as an issue in either this Court or the Court of Appeals, and Mr. Case's counsel agreed at oral argument before this Court that he was no longer pursuing a breach of contract claim. *Case*, 2022 WL 2313548, at *4. Mr. Case also included claims for slander of title and to quiet title in his operative complaint. However, those claims were dismissed by the trial court, and Mr. Case did not appeal that decision.

As there is no common law cause of action for wrongful foreclosure in Tennessee, Mr. Case has no remaining claims in this case. Therefore, we need not reach the final issue of whether the Fannie Mae/Freddie Mac Uniform Tennessee Deed of Trust requires written notice of postponement, in addition to an oral announcement, according to section 35-5-101(f) of the Tennessee Code.

## CONCLUSION

While Mr. Case has standing to bring his claims, we hold that there is no common law cause of action for wrongful foreclosure in Tennessee. Accordingly, we reverse the Court of Appeals' decision in this case and remand to the trial court for entry of an order consistent with this opinion.

_____
DWIGHT E. TARWATER, JUSTICE